**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**McELROY, DEUTSCH, MULVANEY**
**& CARPENTER, LLP**
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4079
(973) 622-7711
Attorneys for Defendant,
Pension Committee of Johnson & Johnson

| | |
|---|---|
| **RALPH R. VAN DEVENTER, JR.,** | **Civil Action No.:  10-6344 (GEB)(DEA)** |
| **Plaintiff,** | |
| -against- | |
| **JOHNSON & JOHNSON PENSION COMMITTEE OF JOHNSON & JOHNSON,** | |
| **Defendant.** | |

**CIVIL ACTION – AFFIDAVIT OF RICHARD MCDONALD IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**STATE OF NEW JERSEY**　　　}
　　　　　　　　　　　　　　　} ss.
**COUNTY OF MIDDLESEX**　　　}

I, Richard McDonald, of full age, being duly sworn according to law and upon my oath, hereby depose and say:

1.　　I hold the position of Director of Corporate Benefits of Johnson & Johnson. ("J&J").  In this capacity, I am responsible for reviewing second level appeals of claims for the

long-term disability ("LTD")[1] benefits on behalf of the Pension Committee of Johnson & Johnson (the "Pension Committee").[2] I personally reviewed the administrative record maintained with respect to Ralph R. Van Deventer, Jr.'s ("Van Deventer") claim for benefits and issued the claim decision with respect to Van Deventer's second level appeal.  As such, I have personal knowledge of the facts and circumstances set forth herein.  On the advice of counsel, this affidavit is being submitted in support of the motion for summary judgment of the Pension Committee.

**OVERVIEW**

2.      The LTD Plan is funded solely through premiums paid by the LTD Plan[3] participants. The Pension Committee is the plan administrator of the LTD Plan. The Pension Committee is conferred discretionary authority to construe the terms of the LTD Plan, and to delegate its authority to render benefit determinations. Reed Group ("Reed") is the Claims Service Organization of the LTD Plan. The Claims Service Organization is responsible for investigating claims for benefits, rendering initial claim determinations and deciding first level appeals.  Second level appeals are decided by me, as a delegate of the Pension Committee.

3.      On September 9, 2008, Van Deventer submitted a telephonic claim for short term disability ("STD") benefits to Reed, representing that he was disabled from his occupation as a Senior Compliance Analyst, in the Ortho-Clinical Diagnostics Division of J&J as of September 8, 2008, due to back pain and tendonitis of the left Achilles tendon.  Reed initially approved Van Deventer's claim for benefits until his treating physician, Irving D. Strouse, M.D. P.A. ("Dr.

---

[1] Attached hereto as Exhibit 1 are relevant portions of the Summary Plan Description for the Johnson & Johnson Choices Benefit Plan.  The Summary Plan Description includes the Choices Disability Plans, Plan Details 2008 Plan Year and the General/Administrative Information Plan Details for the 2009 Plan Year.
[2] Attached hereto as Exhibit 2 is a true and correct copy of the Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson and Affiliated Companies (the "LTD Plan").
[3] The entire administrative record is attached hereto as Exhibit 3 and will subsequently be referred to solely by Bates Stamp numbers.

Strouse"), concluded that Van Deventer could return to work on a part-time basis beginning March 2, 2009, and full-time, without restrictions after April 5, 2009.   Van Deventer returned to work under a modified work plan beginning March 2, 2009.

4.     Van Deventer returned to work, but stopped working again on July 21, 2009, stating that he could no longer continue due to back and neck pain.  Van Deventer applied for and received LTD benefits for the period March 9, 2009 through March 9, 2010, in accordance with the "own occupation" provision of the LTD Plan.  Under the terms of the LTD Plan, for Van Deventer to continue receiving benefits beyond March 9, 2010, he needed to be totally disabled from "any job" as defined by the LTD Plan. (Exhibit 2, p. 5). However, the administrative record did not support the conclusion that Van Deventer was disabled from "any job" as defined by the LTD Plan, and therefore, Van Deventer's LTD benefits ended effective March 9, 2010.  Van Deventer submitted two appeals, both of which were denied based upon the complete administrative record, including two independent medical reviews, four independent medical examinations and a functional capacity evaluation. Van Deventer failed to submit diagnostic test results or other documentation supporting that he was unable to perform the duties of "any job" as defined by the LTD Plan.   The administrative record overwhelmingly demonstrates that Van Deventer was not eligible for LTD benefits as he did not meet the LTD Plan's definition of disability from any job.  Consequently, the claim determination is clearly supported by the administrative record and should be upheld.

A.     **APPLICABLE TERMS OF THE LTD PLAN**

5.     A participant is eligible for monthly LTD benefits if he submits proof of loss that he is unable to perform the essential functions of his regular occupation (with or without reasonable accommodations) for one year and, thereafter, a participant is eligible for benefits if

he provides proof of loss that he is unable to do any job for which he is, or may reasonably become, qualified by training, education or experience (Exhibit 1, Choices Disability Plan, Plan Details at p. 11).  Specifically, the LTD Pan sets forth the requirements for establishing a claim for long-tem disability benefits:

## LONG TERM DISABILITY COVERAGE

The Long Term Disability (LTD) Plan is designed to begin when your 26 weeks of STD ends, provided you are totally disabled and you are enrolled in the LTD Plan.

A **Long Term Disability** is a disability in which you have become unable to perform the essential functions of your regular occupation (with or without reasonable accommodations) during the first year of benefit payments.  For benefits to continue after one year, you must be **unable to work in any occupation (with or without reasonable accommodations) for which you are, or could be qualified by training, education or experience.** [emphasis added].

You must be under the regular care of an appropriate licensed health care provider, routinely adhere to an approved treatment plan and provide continued medical evidence of your disability. You must also cooperate in the medical evaluation process, including submitting to a medical exam and providing documentation, etc., if requested by Reed Group.  Failure to do so will result in the denial or termination of your benefits.

(Exhibit 1, Choices Disability Plan, Plan Details at p. 11).

6.    Pursuant to the terms of the LTD Plan:

## TOTAL DISABILITY

"**Total Disability**" or "**Totally Disabled**" means:

\*\*\*

(b) during the portion of any period of disability not exceeding 12 months following the duration of the Elimination Period, the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of his or her Regular Occupation, with or without reasonable accommodation; AND

4

> (c) during the remainder, if any, of the period of disability, the complete inability of the Participant, due to Sickness or Injury, to perform **any job** for which the Participant is (or may reasonably become) with or without reasonable accommodation qualified by training, education or experience.

(Exhibit 2, at p.6).

7.      The LTD Plan further provides that it is a participant's responsibility to submit proof establishing continued eligibility for LTD benefits and that he or she may be required to undergo independent medical examinations, functional capacity evaluations and other evaluations of a participant's medical status and eligibility for benefits under the LTD Plan. (Exhibit 2, at p. 13).  The LTD Plan specifically provides:

### EVALUATION OF PARTICIPANT'S MEDICAL STATUS

> The Plan Administrator and its authorized representatives, including without limitation the Claims Service Organization,[4] shall have the right to conduct evaluations of a Participant's medical status and eligibility for benefits under the Plan at any time while an application for benefits is pending, a Participant is receiving benefits or a claim or claim appeal is pending.  It is the Participant's responsibility to provide the Claims Service Organization with all information necessary to evaluate his or her medical condition and functional capacity, including but not limited to information supplied by the treating Provider.

> At the discretion of the Plan Administrator or its authorized representative, the evaluation may include medical examination(s) by a Plan Provider, at no cost to the Participant.  The Plan Provider may also, from time to time, evaluate the Approved Treatment Plan prescribed by the Approved Treatment Provider, to determine whether it conforms to generally accepted medical practice for the Participant's Sickness or Injury and whether the Approved Treatment Plan is being adhered to by the Participant.

(Exhibit 2, at p. 13).

---

[4] "Claims Service Organization" is defined by the Plan to mean "a corporation, or other entity, retained by the Plan Administrator on behalf of the Plan to provide specified administrative services to the Plan." (Exhibit 2, at p. 2).

8.      The LTD Plan provides a monthly benefit in the amount of a chosen percentage of a participant's Regular Monthly Earnings following a 26-week Elimination Period, reduced by certain offsets including, but not limited to, Primary and Family Social Security Disability benefits (Exhibit 2, at p. 16-17):

> The following adjustments to benefits refer to benefits to which the Participant would be entitled if the prescribed application were made.  Any lump sum payouts form the sources, below, will offset LTD benefit until the cumulative amount has been exhausted.
>
> ***
>
> (2)      The Primary Social Security Disability Benefit (SSDB) excluding (a) any increase in such benefit on or subsequent to both the date the Participant first receives the Primary Social Security Disability Benefit and the date on which the Participant qualifies to receive benefits under this Plan; AND (b) benefits paid to a former spouse of the Participant or to a child of the Participant residing with such former spouse.  Any Social Security survivor's benefit payable with respect to a Participant on account of the death of his or her spouse shall NOT be an adjustment to benefits.

(Exhibit 2, p. 17).

9.      The plan administrator is the Pension Committee, which is conferred discretionary authority and the power to delegate its authority (Exhibit 2, at p. 22).  **ARTICLE VII** addresses the administration of the Plan and provides as follows:

> **FIDUCIARY**
>
> The named fiduciary of this Plan shall be the Johnson & Johnson Pension Committee (hereafter referred to as "the Pension Committee").
>
> **POWERS – GENERAL**
>
> The named fiduciary shall control and manage the operation and administration of the Plan, may designate persons to assist in carrying out fiduciary duties, and may allocate responsibility for the operation and administration of this Plan.  The named fiduciary

may exercise discretion in making determinations of fact, interpreting the terms of the Plan, adopting rules and taking other actions with respect to which it has authority. Any interpretation or determination made pursuant to such discretionary authority shall be conclusive and given full force and effect, subject to any right to appeal the interpretation or determination as set forth in Article IV. No determination by the Claims Service Organization, the Plan Administrator or any other Plan fiduciary in one case shall create a bias or retroactive adjustment in any other case.

The Pension Committee has the sole authority to:

(1)    Make any amendment to the Plan;

\* \* \*

(10)    Exercise its discretion to determine eligibility for benefits, to construe and interpret the provisions of the Plan and to render conclusive and binding decisions and determinations based thereon;

\* \* \*

(12)    Delegate its authority established hereunder;

(13)    Appoint persons or committees to assist it to perform its duties hereunder;

\* \* \*

(15)    Supervise the claims services provided by the Claims Service Organization; and

(16)    Exercise final authority and responsibility for administration and operation of the Plan, including without limitation adjudication of all claims and claims appeals.

To the extent that the Pension Committee allocates any of its fiduciary responsibilities, the party assuming such responsibility shall have all of the discretion and authority of the Pension Committee with respect to the performance of that responsibility and shall be solely responsible for the performance thereof.

(Exhibit 2, at p.22-24).

10.    LTD benefits under the LTD Plan are funded solely by contributions from its

participants:

## ESTABLISHMENT OF TRUST AGREEMENT

> Concurrent with the establishment of this Plan, the Company has established the Johnson & Johnson Voluntary Employee Benefit Trust (hereafter referred to as "the Trust") to provide the benefits set forth in Articles IV and V of this Plan. Contributions shall be made by Participants in such amounts and proportions as the Company or its designees determines necessary to provide benefits under the Plan on an actuarially sound funding basis. All such contributions shall be deposited in the Trust for the purpose of providing benefits under this Plan and for payment of administrative expenses associated with the operation of the Plan. The Pension Committee or its designee shall act as administrator of the Plan. Neither the Company nor the Pension Committee shall be liable to provide any benefits under the Plan and the benefits payable under Article IV and V shall be payable only to the extent that the funds of the Trust are sufficient.

(Exhibit 2 at p. 25).

B.      **VAN DEVENTER'S CLAIM FOR STD BENEFITS**

11.     Van Deventer telephonically submitted a claim for short-term disability benefits on September 9, 2008, stating that he was disabled from his occupation as a Senior Compliance Analyst as of September 8, 2008, due to tenosynovitis of his left ankle and back pain initially resulting from an accident in 1979 which, according to Van Deventer, had exacerbated into lumbar spine osteoarthritis and back strain. (J&J 0017).

12.     On September 12, 2008, Reed, the Claims Service Organization, received a Job Analysis Worksheet prepared by Van Deventer's immediate supervisor. Van Deventer's duties were described as follows:

> Reviews and approves drug and device history records ensuring that they meet technical accuracy requirements, compliance with quality system regulations and GMP's, and compliance with J&J corporate and internal OCD processes and procedures. Identifies and follows up with manufacturing on device history record discrepancies. Prepares and verifies certificates of conformance and CBER protocols.

Van Deventer's job was described as requiring frequent lifting of up to 10 lbs but seldom requiring lifting in excess of 10 lbs. Occupational requirements include hearing, talking, and simple grasp. No occupational hazards were indicated. (J&J 00574-00575).

13.     Thereafter, Reed received executed authorizations and a reimbursement agreement from Van Deventer along with an initial attending physician's statement from Van Deventer's treating physician, Dr. Strouse, dated September 29, 2008. Van Deventer's primary diagnosis was stated to be "tenosynovitis of the left ankle" and his secondary diagnosis was "lumbar sprain." Dr. Strouse set forth a return to work date of October 27, 2008. Reed also received a copy of a prescription for Van Deventer prescribing physical therapy three times a week. (J&J 00559-00562).

14.     By correspondence dated September 19, 2008, Reed approved Van Deventer's claim for STD benefits, pending receipt of medical information from Van Deventer's treating physician. (J&J 00556-00572).

15.     Reed received an office visit note from Dr. Strouse dated October 17, 2008, stating that "[p]atient is still having difficulty with both his lumbar spine and Achilles tendon." The Physician's Plan included the continuation of physical therapy and Van Deventer's continued out of work status. (J&J 00549).

16.     A second office visit note dated November 10, 2008, was received from Dr. Strouse stating:

> [p]atient seems to have improved as far as his left Achilles tendon is concerned. The mass has decreased. The tenderness is less. He has continued with his walking boot. He still has significant lower back pain however. There is no change in his neurologic status, but he is complaining of increased left sciatica.

Dr. Strouse ordered an MRI of the lumbar spine and continued physical therapy. (J&J 00545).

17.     By facsimile dated November 14, 2008, Reed received an "Excuse Slip" from Dr. Strouse dated November 13, 2008, instructing Van Deventer to remain out of work until December 1, 2008.   The diagnosis remained the same, and no further explanation for the extended delay in the return to work date was given. (J&J 00541).

18.     An MRI of Van Deventer's lumbar spine was taken at Advanced Medical Imaging of Toms River on November 13, 2008.  The findings were stated as follows:

> The conus is intrinsically normal and located at the L1 level.  No cord compression is seen. T11-12-L2-3, There is no disc bulge or herniation. There is mild facet degenerative changes without central canal, lateral recess or neural foraminal stenosis.  L3-4 – There is disc desiccation and degenerative changes of the apposing endplates.   There is a slight disc bulge.  There is facet degenerative changes.  There is no central canal lateral recess or neural foraminal stenosis. L4-5:  There is disc desiccation.  There is a disc bulge more prominent posterolaterally in the inferior neural foramen with a superimposed disc herniation in the far right lateral neural foramen.  There is facet degenerative changes.  There is mild lateral recess and neutral foraminal encroachment.  There is mild central canal stenosis. L5-S1:  There is sacralization of L5 with a disc remnant at this level.  There is no disc bulge or herniation.  No central canal, lateral recess or neural foraminal stenosis is seen.  Impression:  Transitional type vertebral body referred to as L5 for this report.   Disc bulge L4-5 and L3-4 with a superimposed disc herniaiton in the right neural foramen at L4-5.  Diffuse facet degenerative changes.

(J&J 00536-00537).

19.     Thereafter, Reed received an office visit note from Dr. Strouse dated November 24, 2008, stating:

> Patient did have an MRI performed of his lumbar spine, which I reviewed. There is transitional type vertebra.  There is disc bulge at L4-L5 and L3-4 with superimposed disc herniation along the right neural foramina at L4-L5. There was diffuse degenerative change.   Neurologic exam remains unchanged.  He is still significantly tender over the Achilles.  For now we will continue physical therapy and keep him out of work.

No return to work date was stated on the office visit note.  (J&J 00518).

10

20.     Reed received an additional "Excuse Slip" from Dr. Strouse dated November 24 2008, instructing Van Deventer to remain out of work until December 29, 2008.  The diagnosis of Achilles Tenosynovitis and Lumbar sprain L4-L5 remained the same.  No further explanation for the extended delay in the return to work date was given. (J&J 00530).  Reed received another office visit note and prescription for physical therapy from Dr. Strouse dated December 22, 2008, stating that Van Deventer's medical status remained "unchanged."   Dr. Strouse recommended Van Deventer continue with physical therapy three times a week for four weeks and see a pain management specialist. (J&J 00521).

21.     By facsimile dated December 29, 2008, an "Excuse Slip" was received from Dr. Strouse, with no diagnosis.  The note indicated that Van Deventer should remain out of work for "1 month" and scheduled a follow up visit with Dr. Strouse for January 20, 2009.  (J&J 00521).

22.     By correspondence dated January 2, 2009, Reed requested that Norman Heyman, M.D. ("Dr. Heyman") perform an independent medical evaluation on Van Deventer to assess his current medical condition and to determine specifically what functions Van Deventer was capable of performing. (J&J 00514).

23.     By correspondence dated January 28, 2009, Reed informed Van Deventer that his STD benefits were approved for the period September 8, 2008 through March 2, 2009, and that Reed would continue to require and review medical evidence provided in support of his disability.  (J&J 00486-00487).

24.     On January 13, 2009, Van Deventer underwent an independent medical examination with Dr. Heyman, who stated that Van Deventer indicated that "his back was starting to improve, but he is not at the point where he believes he can go to work and his back

hurts if he sits for too long and he cannot stand for too long." In addition to physically examining

Van Deventer, Dr. Heyman reviewed Van Deventer's medical records, and concluded:

> I think he [Van Deventer] is capable of performing his current job,
> in the sedentary position and in walking around and standing for
> short periods of time.  I do not believe at this point in time he
> requires the air walking cam boot.  He can be treated with either a
> lift inside the shoe or a lift outside the shoe to protect the Achilles
> tendon.  Therefore, I think he can perform his sitting and walking
> around minimally, but I do not believe he can lift heavy objects
> and bring them to shoulder level, standing for long periods of time,
> and sitting for short periods of time.  As noted, he is capable of
> sitting for short periods of time with occasional standing and
> walking around and standing for short periods of time.  **I think the
> patient is capable of working for 8 hours a day, but he will
> have to take frequent breaks, be able to standing, and be able
> to walk around with certain frequency and he must be sitting
> with a lumbar roll in the lumbar lordosis to put the least
> amount of load and least amount of strain on his back.**
> [emphasis added].

(J&J 00495-00499).

25.    On January 21, 2009, Reed received an office visit note dated January 13, 2009,

from Zulfjqar A. Rajput, M.D. ("Dr. Rajput"), a Board certified psychologist, stating that Van

Deventer was suffering from "depression and anxiety."  The note stated that Van Deventer was

currently under Dr. Rajput's care and was taking medications, but did not set forth the

medications or the treatment plan for Van Deventer. (J&J 00492-00494).

26.    By correspondence dated January 28, 2009, Reed received a Release to Work

Form from Dr. Strouse releasing Van Deventer to return to sedentary work "3-4 hours per day

from home" beginning February 2, 2009. (J&J 00480-00481). Reed also received an office visit

note from Dr. Strouse with the Return to Work Release dated January 27, 2009, stating:

> Patient [Van Deventer] is much improved as far as the Achilles tendon is
> concerned.  The lump is markedly reduced in size.  He seems to have less
> tenderness and better strength.  He can wean himself out of the walking
> boot. As far as his back is concerned, he has seen the pain management

12

specialist and has had one epidural block.  Another is scheduled for two weeks.  There is no change in his neuralgic status.  He does appear to be able to work limited duty for approximately four hours per day.

(J&J 00482).

27.     By correspondence dated January 29, 2009, Van Deventer wrote to Reed to clarify what he labeled as "errors or misunderstandings" in Dr. Heyman's report.  Van Deventer stated that Dr. Heyman did not receive and review his doctor's orthopedic notes.  However, Dr. Heyman's report stated that he reviewed all the office notes provided by Dr. Strouse that were available at the time of his review, and specifically set forth what he reviewed in the Medical Documents Reviewed section of his report.  Van Deventer also stated that Dr. Heyman did not review physical therapy notes, however, the physical therapy notes were not submitted to Reed until October 1, 2009, after Dr. Heyman conducted his medical review.  Consequently, these notes were not available to Dr. Heyman at the time of his review.  Van Deventer made various other representations about conversations with Dr. Heyman relating to his prior treatment plans. (J&J 00464-00467, J&J 00453).

28.     Reed requested that Dr. Heyman address the issues raised by Van Deventer.  Dr. Heyman responded by correspondence dated February 11, 2009, stating:  "his [Van Deventer's] added information in his critique of my report and was [sic] not discussed during the exam as treatment was not discussed at all, nor did I discuss the examination."  (J&J 00453).

C.     **VAN DEVENTER'S CLAIM FOR LTD BENEFITS**

29.     Reed received a claim form for LTD benefits from Van Deventer dated January 28, 2009.  Van Deventer stated that he could no longer continue to work due to his "back pain" and his "Achilles pain" which "becomes stiff with a burning sensation in his calf."  (J&J 00476-00478).

30.    Reed also received an Attending Physician Statement from Dr. Strouse dated February 5, 2009, acknowledging that Van Deventer was no longer totally disabled and releasing Van Deventer to sedentary work, part time, four hours per day beginning February 1, 2009. (J&J 00454-00455).

31.    By facsimile on February 10, 2009, Reed received two reports from Carmen M. Quinones, M.D., ('Dr. Quinones") at the Pain Institute of New Jersey ("PINJ") related to an initial evaluation of Van Deventer dated January 19, 2009, and repeat epidural steroid injections that Van Deventer received on January 26, 2009, and February 9, 2009.  Dr. Quinones's general impressions were stated to be: "[t]he patient appears their [sic] stated age and is in no acute distress."   The Treatment Plan included a series of injections. (J&J 00447, 00451-00452).

32.    At the request of Reed, on February 12, 2009, Kenneth Kutner, M.D. ("Dr. Kutner"), Board certified neurologist, performed an independent medical examination of Van Deventer.   In addition to examining Van Deventer, Dr. Kutner reviewed the medical records available at the time of his review and concluded:

> **Mr. Van Deventer is psychologically and cognitively capable of performing an 8-hour per day job** [emphasis added]….Van Deventer's dysthymia and anticipatory anxiety do not reach the level of functional impairment, which would prevent him from working full time in his position as a Senior Compliance Analyst….It is recommended that he [Van Deventer] receive psychotherapy utilizing cognitive behavioral techniques, which would focus on a) assisting him in coping with his physical condition b) reducing his dysthymia and c) reducing anticipatory anxiety through development of more effective coping strategies. Mr. Van Deventer is seen to be capable of returning to work without limitations or restrictions for cognitive and/or psychological factors.

(J&J 00438-00445).

33.         On February 23, 2009, Reed requested that Dr. Strouse complete a Return to Work form for Van Deventer, stating that his worksite has agreed to accommodate a 4 hour per day sedentary position:

> Please fill out the attached form if you feel this patient [Van Deventer] is able to work 4 hours a day, sedentary position at the worksite. Please include a start date (3/2/09) and an end date to the restrictions.

(J&J 00435).

34.         Dr. Strouse completed the Release to Work form limiting Van Deventer to 4 hours per day of sedentary work beginning on March 2, 2009, and ending on April 6, 2009, releasing Van Deventer to full time work unrestricted after April 6, 2009. He also completed a form restricting Van Deventer's driving to 2 hours per day. (J&J 00433-00434).

35.         By correspondence dated March 4, 2009, Reed informed Van Deventer that he had been approved for STD benefits for the period September 8, 2008 through March 8, 2009, and that based upon the medical information provided by his treating provider, he was approved for modified work beginning March 2, 2009. (J&J 00431-00432).   Van Deventer received STD benefits for the maximum benefits period.   By correspondence dated March 10, 2009, Reed informed Van Deventer that he had been approved for "rehabilitation employment" for the period from March 9, 2009 through April 5, 2009, pursuant to the terms of the LTD Plan. (J&J 00429-00430).

36.         By letter dated April 8, 2009, Van Deventer was notified that his LTD benefits would end as of April 5, 2009, because the medical documentation did not support a continuation of disability, and he was released to return to work full time by his primary care physician, Dr. Strouse. Reed provided Van Deventer with instructions as to how to appeal the determination

and a description of the clinical documentation required supporting an appeal. (J&J 00427-00428). Van Deventer was working full time.

37.  Reed received by correspondence dated June 5, 2009, medical records from Van Deventer, including copies of an MRI report of Van Deventer's cervical spine dated May 22, 2009, finding "[m]ulti-level cervical spondyloisthesis, most notable in the upper cervical spine at C4-C5, which results in mild cord compression without intrinsic cord signal alteration," a prescription from Dr. Strouse for continued physical therapy, and a letter dated June 3, 2009, from Van Deventer to Reed describing his condition and experience. Van Deventer stated that after he transitioned from the rehabilitative work program to full-time work he began to experience pain in his neck, pain in the right side of his head "like a bad headache" causing him to seek an MRI. Van Deventer stated that it was dangerous for him to drive because he could "hardly turn his neck," and that the results of the MRI showed, "multiple disk problems (bulges, stenosis, and spinal cord compression) in all but one disk. The actual MRI report classified Van Deventer's disc bulges and stenosis as "mild" in all disk areas except for C4-C5, where the disc bulge was classified as mild-moderate. (J&J 00417-00426).

38.  By correspondence dated June 12, 2009, Reed received the following additional medical records from Van Deventer:

- Note from Dr. Strouse dated June 11, 2009, stating:

  > Ralph Van Deventer is under my care for cervical disc degeneration and herniation in both the cervical and lumbar spine. He also underwent arthroscopic surgery of his right knee in 2005 and has been treated for Achilles tendonitis of his left heel. Please be advised because of these medical conditions, I consider him to be a candidate for long term disability. (J&J 00405).

- Four short office visit notes, with no other medical documentation from Dr. Strouse dated 3/27/09, 4/28/09, 5/12/09, and 5/29/09.

- MRI report dated May 26, 2009, previously submitted by Van Deventer.

- Note from Dr. Rajput stating that Van Deventer is suffering from depression and anxiety and not responding well to medications.

(J&J 00404-00412).

39.     Reed also received an operative report relating to four spinal injections that Van Deventer received on June 24, 2009, at the PINJ.  Van Deventer requested that Reed add the information to his file. (J&J 00400-00403). By correspondence dated June 25, 2009, Reed acknowledged receipt of medical information from Van Deventer, and notified him that if the information was submitted in support of his appeal of the denial of his LTD benefits, he was required to submit a letter specifically stating that he was appealing the denial of his LTD benefits. (J&J 00398).

40.     Reed received additional medical records from Van Deventer dated July 21, 2009, related to spinal injections he had undergone at PINJ.  Van Deventer stated that he had undergone 11 injections to date. (J&J 00390-00392).

41.     Reed also received a letter from Van Deventer dated July 21, 2009, identifying his last day worked and setting forth his current medical conditions.  The medical records received included an Excuse Slip from Dr. Strouse; two office visit notes from Dr. Strouse dated June 11, 2009 (previously submitted by Van Deventer by correspondence dated June 12, 2009, and dated July 14, 2009; emergency room records; and physical therapy reports for visits between the period June 8, 2009 and July 8, 2009 – all indicating that **"patient's rehabilitation potential is excellent"** [emphasis added]. (J&J 00384-00389). Van Deventer stated in his letter that his condition had worsened since the last time he submitted medical documentation causing "relentless headaches that cause nausea/vomiting" and that he could no longer continue to work.

(J&J 00373). Van Deventer stated that Dr. Strouse wanted him to see a neurologist to rule out the possibility that "the problem may be originating in my head." (J&J 00373-00377).

42.     Van Deventer stated that he "walked out of work" on July 20, 2009.  An Excuse Slip received from Dr. Strouse dated July 17, 2009, diagnosed Van Deventer with "degenerative disc disease, cervical 722.4, lumbar spine."  No specific restrictions were identified, nor were any other medical records provided in support of his opinion.  The note stated that Van Deventer should "remain out of work as of 7/21/09 til future notice." (J&J 00376).  The only support Reed received from Dr. Strouse to place Van Deventer on disability again was an office visit note dated July 14, 2009, stating:

> [p]atient has difficulty in his neck and back.  He has disc disease in both areas with degeneration and herniation.  **He [Van Deventer] is presently working but is seeking permanent disability**.  There is no change in his neurologic status.  [emphasis added].

(J&J 00377). The note states that the patient is seeking permanent disability, but Dr. Strouse does not provide any medical documentation or test results to support that conclusion. (J&J 00373-00377).

43.     On July 15, 2009, Van Deventer presented himself at the emergency room at St. Barnabas where he was classified as "stable" and received a diagnosis of "acute headache."  He informed the emergency room that he had been having headaches with nausea for five weeks and was instructed by his orthopedic to make an appointment with a neurologist.  (J&J 00378-00383).

44.     A functional capacity evaluation was conducted by Charles Filippone ("Mr. Filippone") PT, at Cooper Rehab & Sports Therapy on July 23, 2009, who concluded that the results were unreliable and not an accurate portrayal of Van Deventer's maximum physical capacity because of Van Deventer's self-limited performance during the evaluation.   Mr.

Filippone stated that Van Deventer had "demonstrated an inconsistent effort through all of the six components of the evaluation:"

> **Mr. Van Deventer's significantly self-limited performance during this evaluation was not an accurate portrayal of his maximum physical abilities.** Based on Mr. Van Deventer's significantly self-limited performance during all 6 components of this evaluation, he does not meet the essential postural and physical demands of his occupation at this time. **Due to Mr. Van Deventer's significantly self-limited performance during the physical examination, an accurate determination of his full ability to performed postural tasks of his occupation over the course of an 8 hour work day can not be determined. Due to Mr. Van Deventer's significantly self-limited performance during whole body strength testing, which did not meet the essential demands for even performing at sedentary duty, an accurate assessment of his physical strength abilities can not be determined. When Mr. Van Deventer is prepared to provide a sincere effort during all components of the evaluation, he may be retested and postural and physical abilities can be determined and any alterations/modifications to the demands of his occupation – if necessary- can be proposed based on his performance.** [emphasis added]

By way of example, when Mr. Filippone was testing Upper Extremity Strength Van Deventer demonstrated grip strength "more than 4 standard deviations below normal when compared to age and gender matched normative data.... Despite the examinee's self-limited performance during grip strength testing, his demonstrated grip strength meets the essential demands of his occupation." Upon physical examination:

> The examinee demonstrated giveaway weakness of the upper and lower extremities during manual muscle testing, however he was able to heel and toe walk. The examinee demonstrates decreased range of motion of the cervical spine in all planes, secondary to active voluntary muscle restriction rather than hard or leathary end range feel. He demonstrated a voluntary limitation of lumbar range of motion in all planes. The examinee demonstrated decreased flexion of the hips bilaterally with empty and range feel. The examinee demonstrates positive straight leg raise values bilaterally, but was able to sit on the edge of a plinth and fully extend his knee with his thigh supported by the plinth. **This is**

**inconsistent with his performance during lumbar spine evaluation.** [emphasis added].

(J&J 00351-00371).

45.     By facsimile dated July 31, 2009, Reed received a correspondence from Van Deventer providing a list of his current medications. (J&J 00344-00345).

46.     Reed also received a second correspondence from Van Deventer dated July 31, 2009, that included a report dated July 22, 2009, from neurologist, Samuel D. Schenker, M.D., L.L.C; D.A.A.P.M. ("Dr. Schenker"), and a post operative note from Dr. Schenker, dated July 27, 2009, relating to a spinal injection administered to Van Deventer.  Dr. Schenker stated: "[t]he patient [Van Deventer] demonstrated good response to said injection without any untoward effects.  The patient demonstrates good cognitive status and is discharged from the office on his own recognizance."  Dr. Schenker's treatment plan included a "Medrol pack" and to "consider the possibility of underlying rheumatological disorder as well as Lyme disease, which has not been ruled out, because of the patient's symtomatology at this time" and facet blocks of the cervical spine.  (J&J 00346-00350).

47.     On July 29, 2009, Van Deventer underwent an independent medical examination performed by Lawrence I. Barr, M.D. ("Dr. Barr"), an independent spine surgeon.  Dr. Barr's impression of Van Deventer included degenerative disc disease, cervical spine with cervical facet syndrome; degenerative disc disease, lumbar spine, with lumbar facet syndrome; depression and anxiety; and Achilles tendinosis, left.  Dr. Barr concluded:

> In regard to the examinee's ability to work, he is capable of sedentary duty only.  He must be able to change his position every 30 minutes.  He should be able to work an eight-hour day, but limited to sedentary duty with no bending or lifting as well as frequent position changes.

(J&J 00337-00342).

48.     By correspondence dated August 4, 2009, Dr. Barr commented that he had reviewed the functional capacity evaluation dated July 23, 2009, and noted that Biokinetics stated that Van Deventer demonstrated inconsistent effort.  Dr. Barr stated the report did not change his findings. (J&J 00343).

D.     **VAN DEVENTER'S BENEFITS ARE REINSTATED**

49.     By letter dated August 7, 2009, Van Deventer sent Reed an updated list of his current medications and a note from his neurologist, Dr. Schenker regarding the cervical facet injection procedure administered on August 5, 2009.  (J&J 00331-00334).

50.     By correspondence dated August 7, 2009, Reed acknowledged receipt of Van Deventer's request for copies of his medical records. (J&J 00335-00336).

51.     Reed reinstated Van Deventer's LTD benefits effective July 21, 2009, by correspondence dated September 4, 2009. (J&J 00324-00328).

52.     By correspondence dated September 14, 2009, Reed informed Van Deventer that he was not meeting the LTD guidelines requiring that he follow an approved treatment plan.  The letter informed Van Deventer that if he did not take action within 30 days of the date of the letter, his LTD benefits would be terminated. (J&J 00321-00323).

53.     Reed received medical records from Van Deventer by correspondence dated October 1, 2009, including:

   1)  a prescription from Dr. Schenker for pain management;

   2)  a prescription from Dr. Strouse for PT to issue a home program;

   3)  PT evaluation and report from Jamie Vallone ("Ms. Vallone")
       of Heartland Rehabilitation Services,  stating:

> **The patient's rehabilitation potential is**
> **excellent.  Patient presented with decreased**

> **pain following completion of today's treatment session.** [emphasis added].

    4)    a copy of the home exercise program.

(J&J 00308-00318).

54.    On October 6, 2009, Van Deventer submitted a medical note from Dr. Schenker dated September 18, 2009, stating that Van Deventer was being seen for post cervical facet injections and that Van Deventer has done "extraordinarily well at this juncture with the cervical spine, but still has residual lumbosacral pain."  Reed also received an office visit note from Dr. Strouse dated September 21, 2009, stating:

> [p]atient has been declared disabled.  He had an Independent Medical Examination whereupon home exercises were recommended as well as anti-inflammatory medicine.  I gave him a prescription to both his neck and back.

(J&J 00305-00307).

55.    Reed received medical records from Van Deventer by correspondence dated November 7, 2009.  The records included a physician contact sheet; authorization executed by Van Deventer for the release of medical records dated November 23, 2009; attending physician statement from Dr. Strouse dated December 3, 2009; a re-evaluation report from Heartland Rehabilitation Services; chiropractic and physical therapy office visit notes for the period from October 21, 2009, through December 1, 2009; a progress note from Dr. Schenker, dated November 20, 2009, stating:  "[t]he patient has done extremely well post injection.  He has good range-of-motion with minimal discomfort;" and a post operative note from Dr. Schenker dated November 25, 2009, following an epidural injection stating: "[t]he patient demonstrated a good response to said injection without any untoward effects.  The patient demonstrates good

cognitive status and is discharged from this office on his own cognizance." Ms. Vallone stated by report dated September 30, 2009:

> Patient reports that he has been unable to work since 7/21/09 secondary to increased pain through lumbar and cervical spine. Patient reports increased pain through the cervical and lumbar spine with sleeping, driving, sitting, etc.
>
> ***
>
> **Assessment:**
>
> The patient's rehabilitation potential is excellent. Patient presented with decreased pain following completion of today's treatment session.

(J&J 00225-00260).

E.    **ANY OCCUPATION ANALYSIS**

56.    By correspondence dated November 9, 2009, Reed informed Van Deventer that the initial period of LTD benefits under the "own occupation" definition of total disability would end on March 9, 2010, and to continue to receive LTD benefits, he would need to demonstrate that he was totally disabled from "any job" for which he is or may become qualified by training, education and experience. (J&J 00297-00298).

57.    By correspondence dated November 12, 2009, Reed instructed Van Deventer that he was required to submit proof that he submitted a claim for Social Security disability income benefits. (J&J 00296). By facsimile received on December 11, 2011, Van Deventer informed Reed that Allsup had filed a claim for Social Security benefits on his behalf. (J&J 00223-224).

58.    By correspondences dated December 17, 2009, Reed requested that Dr. Barr perform a second independent medical examination (J&J 00218) and that Mr. Filippone perform a second functional capacity evaluation on Van Deventer. (J&J 00219).

59.   On January 7, 2010, Van Deventer underwent a second functional capacity evaluation with Mr. Filippone.  Mr. Filippone previously determined that the results of his first functional capacity evaluation were unreliable because of Van Deventer's self limited performance. During the second functional capacity evaluation, Mr. Filippone determined that Van Deventer demonstrated a consistent effort in most aspects of the testing and that Van Deventer <u>was capable of performing</u> the demands of <u>any</u> sedentary occupation.  Specifically, Mr. Filippone stated:

> The examinee demonstrated a consistent effort during 4 of 6 components of this evaluation.  He demonstrated a high CoV in 8 of 15 whole body strength tasks performed and a self-limited performance during gait testing.  **His overall performance is an accurate portrayal of his maximum physical abilities**, while his performance during the whole body strength testing and gait testing is not. [emphasis added].

In conclusion, Mr. Filippone stated:

> **Based on Van Deventer's performance, he meets the essential postural and physical demands of any sedentary occupation without restriction for an eight hour work day**. [emphasis added].

(J&J 00198-00217).

60.   Dr. Barr performed a second independent medical examination on January 27, 2010.   In addition to physically examining Van Deventer, Dr. Barr reviewed all of the medical records and concluded:

> **It is my opinion that the examinee [Van Deventer] is capable of sedentary duty work only.  He can work and eight-hour day, but he must be able to change his position frequently.  If his job will allow this, then he is capable of working.** [emphasis added].

(J&J 00193-00197).  Dr. Barr concluded as a result of both the July 2009 and January 2010 examinations that Van Deventer was capable of performing the duties of a sedentary job.

61.     By letter dated February 18, 2010, Van Deventer was notified that the medical documentation in the administrative record did not support a finding that he was totally disabled from "any job" as defined under the LTD Plan.  Reed informed Van Deventer that his LTD benefits would cease effective March 9, 2010.  Reed provided Van Deventer with instructions as to how to appeal the determination and a description of the clinical documentation required supporting an appeal. (J&J 00190-00192).

62.     Van Deventer retained counsel who by correspondence dated March 8, 2010, requested a copy of the plan documents and claim file, which was provided. (J&J 00183-00185).

63.     By facsimile dated May 7, 2010, Van Deventer submitted a decision from the Social Security Administration stating that it found Van Deventer to be disabled as of September 8, 2008, and awarding Security benefits in the amount of $2,063.00 beginning in May 2010. Van Deventer received a retroactive payment for the period of March 2009 through April 2010 in the amount of $28,802.00.  (J&J 000171-00174).

F.     **VAN DEVENTER'S FIRST LEVEL APPEAL**

64.     By correspondence dated June 28, 2010, counsel for Van Deventer appealed the denial of Van Deventer's claim for long-term disability benefits (J&J 00150-J&J 00154). The only additional medical information or results submitted in support of Van Deventer's appeal was the functional capacity evaluation report of Ellen Rader Smith ("Ms. Smith") dated June 23, 2010, stating, in part, that Van Deventer unsuccessfully attempted to return to work in 2009. (J&J 00156-00169).  Ms. Smith's findings were largely based upon Van Deventer's self reported complaints and her one meeting with Van Deventer.  Specifically, Ms. Smith stated "he has not improved in the past year, even without working" and concluded that Van Deventer "demonstrates less than sedentary capacities and cannot resume his longstanding career as a

pharmaceutical compliance officer or any sedentary work that requires sustained sitting." Ms. Smith stated:

> In Mr. Van Deventer's case, his altered gait, which relates to his left Achilles tendinosis and related compensatory back pain, prevents full weight bearing on his side and thus having good footing to provide a consistent effort during whole body testing. This does not imply 'self-limiting' behavior or that Mr. Van Deventer did not give a best effort as the Biokinetics FCE concludes – but rather that he cannot because of his impairment.

(J&J 00166).

65.     Reed submitted the entire file for a medical review by Renat Sukhov, M.D. ("Dr. Sukhov"), Board certified in physical medicine and rehabilitation, who concluded that Van Deventer "was capable of sedentary duty work, as long as he could change positions every 30-45 minutes with no lifting." (J&J 138-00141).  Specifically, Dr. Sukhov stated:

> Based upon the objective medical information provided for review, there is not documented evidence of functional limitations that supports the inability to work.  Functional capacity evaluation reports as well as IME evaluations demonstrated evidence of functional abilities to perform sedentary work with frequent changes of position.
>
> The functional capacity evaluation on January 7, 2010 reported that the claimant met essential postural and physical demands of his occupation for any sedentary occupation for an eight hour workday.  On January 27, 2010, Dr. Barr opined that the claimant is capable of sedentary duty work only.
>
> Neurocognitive impairments have not been severe as to restrict psychologically and cognitive incapacity preventing full day work. The neuropsychological evaluation on February 12, 2009 by Dr. Kutner contains detailed information in reference to the cognitive status of the claimant.
>
> ***
>
> The employee is able to work at sedentary capacity in any occupation with restrictions permitting him to change positions every 30-45 minutes.  There is no evidence in the records which can justify a reduction of the claimant's ability to work on a full time basis at her [sic] job.  However, a modified job may be

warranted to decrease the chances for further exacerbation of low back pain. The most commonly mentioned occupational risk factor is lifting.

In conclusion, Dr. Sukhov stated:

> **The records do not provide compelling evidence which would restrict the claimant's ability to sustain at least sedentary capacity work with lifting and carrying 10 pounds occasionally and possibly 10 pounds routinely, waking for two hours in eight-hour workday and sitting for six hours in an eight-hour workday with adequate breaks.** [emphasis added].

(J&J 00137-00140).

66.     By correspondence dated August 10, 2010, Reed upheld the denial of LTD benefits based upon the complete administrative record and the continued lack of clinical data supporting Van Deventer's subjective complaints of pain. This letter states in part: "[w]e have determined that the documentation does not substantiate your disability as defined by the Johnson and Johnson LTD Plan." Reed also provided Van Deventer with instructions as to how to appeal the determination. (J&J 00127-00130).

67.     By correspondence dated August 16, 2010, Van Deventer's counsel acknowledged receipt of Reed's claim determination and requested Reed provide copies of all file entries that were not previously furnished regarding Van Deventer's June 28, 2010 appeal. (J&J 00120). By correspondences dated August 17, 2010, and August 20, 2010, Reed provided counsel with the information requested. (J&J 00122 and J&J 00119).

G.     **VAN DEVENTER'S SECOND LEVEL APPEAL**

68.     Thereafter, by correspondence dated August 24, 2010, Van Deventer's counsel submitted a second appeal. No additional medical documentation was submitted in support of the second appeal. (J&J 00114-00115).

69.     By correspondence dated August 31, 2010, Reed acknowledged receipt of Van Deventer's second appeal, which was forwarded to Johnson & Johnson's Pension Committee for review. (J&J 00113). By correspondence dated October 4, 2010, I acknowledged receipt of Van Deventer's appeal, informing Van Deventer's counsel that we would require a 45 day extension before rendering a final decision. (J&J 00593).

70.     Prior to rendering the final determination, the entire claim file was submitted for another independent medical review, which was conducted by Kevin Trangle, M.D. ("Dr. Trangle"), a Board certified medical examiner.  Dr. Trangle concluded that **"[i]n short,…this individual has been capable of sedentary duty for some time well before the 3/10/10 date when his benefits were terminated."** [emphasis added].   Van Deventer has only had two diagnostic tests performed; an MRI scan of his neck dated 5/22/09 which showed cervical spondylosis in the upper spinal region with minimal cord compression and an MRI of the lumbar spine on 11/13/08 which showed some degenerative desiccation changes.  Dr. Trangle stated: "[t]he patient never had an EMG/NCV study, CAT scan, myelogram or other diagnostic studies beyond these two."  Moreover, Dr. Trangle stated:

> It is my medical opinion based upon a reasonable degree of medical certainty that Mr. Van Deventer is capable of sedentary work.  He had two Functional Capacity Evaluations.  The first one was invalid due to poor effort, the second one showed he could work in a sedentary capacity, and the third one said he could not, but was not validated by any objective measurements or testing for consistency or maximum effort.  The proffered rational for why he could not work was not convincing.
>
> Repetitive examinations by his **own treating physicians and outside examiners never found him to have any objective evidence or neurological abnormalities.** He does have some mild decreased range of motion and he does have some intermittent swelling of his left heel, which does limit him in terms of his ability to walk.  However, he is able to perform in a sedentary

occupation without any problem based upon all of his evaluations. [emphasis added].

His objective tests including the MRI scans of the cervical and lumbar spines do not show him to have any significant lesion that would preclude him from doing sedentary activity. He has **mild degenerative changes** including some facet hypertrophy, disc herniation in one area, but there is no compressive lesion, nerve root edema, nerve root compression, nerve root impingement, foramen stenosis or central canal stenosis. **These mild degenerative changes would not preclude him from working in a sedentary position**. [emphasis added].

\*\*\*

**Tenosynovitis of the foot and ankle does limit him in his ability to have prolonged standing and walking** and that is taken into account, but it **does not limit him in his ability to do sedentary work.** [emphasis added].

Although he has dysthymic disorder, anxiety, and depression, he is able to work and should work without any restrictions. He has undergone **extensive neuropsychological and psychological evaluations** which **deem him to be able to do so without any apparent cognitive disorder**. [emphasis added].

Although cervical and vertebral disc without myelopathy, neuritis and radiculitis is listed, there is absolutely **no evidence he has any of these condition.** [sic]. He has not EMG/NCV study or other objective evidence of electrophysiological abnormalities. His reflex, sensation and motor findings are normal. **In short, there is absolutely no evidence that he has neuritis of any sort**. [emphasis added].

(J&J 00594-00603).

71.     By letter dated November 22, 2010, the denial of Van Deventer's LTD benefits was upheld ("Determination Letter"). (J&J 00605-00611). The Determination Letter provided Van Deventer with the relevant definitions under the LTD Plan document for the term "total disability" as well as the criteria that a plan participant must meet under the LTD Plan to qualify for benefits (Id.). The Determination Letter further stated:

> As part of a review of Mr. Van Deventer's disability status with respect to the transition of the application of the "own occupation" standard of disability to the "any job" standard of disability, Reed arranged for him to undergo a FCE on January 7, 29010. In his report of January 11, 2010 (Admin. Rec. 0198-0217), Charles Filippone, PT, concluded that Mr. Van Deventer was capable of working full-time at a sedentary duty capacity without restrictions.

(J&J 00608). Moreover, Dr. Barr concluded, after performing a second independent medical examination of Van Deventer, in his report dated January 27 2010, that "Van Deventer was now capable of performing a sitting job for 8 hours per day, with the limitation of having the ability to change position as needed." Id.

72. Van Deventer stated in his appeal letter dated August 24, 2010, that because his attempt to return to work in March 2009, with the ability to change positions every 20 minutes, was not successful, Dr. Sukhov's conclusion regarding that ability was invalid. (J&J 00114-00115). However, Van Deventer's earlier attempt to return to work was considered, but not relevant or contemporaneous to Dr. Sukhov's opinion, as the independent medical examination and the functional capacity evaluation were performed in January 2010 and both concluded, six months after Van Deventer ceased working, that Van Deventer was capable of performing sedentary duty work:

> ...we do not find the earlier attempt to return to work relevant to Dr. Sukhov's conclusion. We note that Van Deventer's attempt to return to work was not contemporaneous with the January FCE and IME, or Dr. Sukhov's August 2010 claim file assessment, and was during a period for which Mr. Van Deventer received disability benefits.

(J&J 00608).

73. The Determination Letter further stated:

> Dr. Trangle came to the same conclusion as Dr. Barr, who examined Mr. Van Deventer, and Dr. Sukhov, who also reviewed Mr. Van Deventer's file; that is, that he [Van Deventer] is no longer disabled under the terms of the LTD Plan.

(J&J 00610).

74.     Moreover, contrary to the statements in the appeal letter dated August 24, 2010,
Van Deventer's receipt of Social Security disability income benefits were considered in reaching
the determination that Van Deventer did not qualify for LTD benefits under the "any job"
definition of the LTD Plan.  (J&J 00114-00115). Specifically, the Determination Letter states:

> There is no indication that the SSA's determination was made or
> based upon the same medical evidence utilized by the Plan
> administrator in this determination.  The FCE and the IME reports
> and claim file assessments, described above, upon which this
> determination was, in part, based, could not have been considered
> by the SSA.  Finally, as you may be aware, the definition of
> disability, and the requirements for continued eligibility, under the
> SSA's program and under the Plan are not the same, and therefore
> the ultimate results with respect to Mr. Van Deventer's claim, are
> not necessarily the same.  For example, the SSA program requires
> that age be taken into consideration while the Plan does not require
> that age be considered.  **Accordingly, even if the SSA decision
> was contemporaneous and considered the same medical
> evidence, the difference in definitions and requirements can
> yield different results.** [emphasis added].

(J&J 00610).

75.     The Determination Letter concluded that the medical information provided by
Van Deventer's treating physicians failed to establish that Van Deventer would be unable to
perform the sedentary duties of "any job."  (J&J 00605-00611).  Van Deventer failed to provide
clinical or medical test results supporting his claim that he was disabled from "any job" as
defined under the terms of the LTD Plan.  The only diagnostic tests submitted were an MRI of
the lumbar spine from 2008 and an MRI of the neck and cervical area from 2009, neither of
which found conditions which would prevent Van Deventer from performing the duties of a
sedentary occupation.  In addition, both Dr. Sukhov and Dr. Trangle opined that Van Deventer

could perform sedentary work activities. In fact, Dr. Trangle concluded that Van Deventer has been capable of performing his job functions unrestricted since before March 10, 2010.

## H.   **CONCLUSION**

76.   The claim determination denying Van Deventer's claim for LTD benefits was based upon the complete administrative record, including the conclusions of four independent medical examinations, a functional capacity evaluation and two independent physician reviews. The administrative record lacked clinical or medical test results supporting a functional impairment that would prevent Van Deventer from performing the duties of "any job" as defined in the LTD Plan. There was a complete dearth of information supporting Van Deventer's claim. Accordingly, the claim determination should be upheld.

Richard McDonald

Sworn and subscribed to before me
this _13TH_ day of May, 2011

Notary Public

#1581741v2

CATHERINE T. GOMBAS
NOTARY PUBLIC OF NEW JERSEY
Commission Expires: 9/13/2015