# Exhibit 3 (Part 11)

# Initial Notification Email Template

## Initial Notification

| Name: | Ralph R Van Deventer Jr |
|---|---|
| WWID#: | 10900 |
| Case Number: | 74518 |
| First Day Absent: | 9/8/2008 |

In order to facilitate a safe and timely return to work for this employee, please complete the enclosed Job Analysis form and return to Reed Group via e-mail within two (2) business days following the receipt of this notification. The e-mail address is ReturnToWellness@reedgroup.com. In addition, please provide any pertinent information regarding this claimant that you feel might impact the disability management process.

I will follow up with a benefit determination. Please email me if you have any questions regarding this claim.

Please include either the employee's name or case number in the subject line of your e-mail.

Thank You
Cindy Haverly
Assigned Case Manager

Confidential
Admin Rec. 00573

## Johnson & Johnson

### Job Analysis Worksheet

*(To be Completed by Employee's Immediate Supervisor)*

Employee: Ralph R Van Deventer Jr    Absence ID#: 74518    Job Title: _____Sr. Complaint Analyst_____

Days Worked Per Week: _5___    No. of Hours Per Day: __8__  Overtime required?  ☐ YES  ☒ NO

Brief description of Job Duties: _____Reviews and approves drug and device history records ensuring that they meet technical accuracy requirements, compliance with quality system regulations and GMP's, and compliance with J&J corporate and internal OCD processes and procedures. Identifies and follows up with manufacturing on device history record discrepancies. Prepares and verifies certificates of conformance and CBER protocols._____

**Frequent = 67% – 100%     Occasional = 34% – 66%     Seldom = 1% – 33%     Never = 0%**

I.  Using the above guidelines, please rate each of the following activities as *Frequent, Occasional, Seldom,* or *Never*:

**Physical Abilities**

| Lifting/Carrying | Frequent | Occasional | Seldom | Never |
|---|---|---|---|---|
| 1 – 10 lbs. | ☒ | ☐ | ☐ | ☐ |
| 11 – 25 lbs. | ☐ | ☐ | ☒ | ☐ |
| 26 – 50 lbs. | ☐ | ☐ | ☒ | ☐ |
| 51 – 100 lbs. | ☐ | ☐ | ☒ | ☐ |
| Pushing | ☐ | ☐ | ☒ | ☐ |
| Pulling | ☐ | ☐ | ☒ | ☐ |
| Reaching | ☐ | ☐ | ☒ | ☐ |
| Overhead Work | ☒ | ☐ | ☒ | ☐ |
| Sitting | ☒ | ☐ | ☐ | ☐ |
| Standing | ☐ | ☒ | ☐ | ☐ |
| Walking | ☐ | ☒ | ☐ | ☐ |
| Kneeling | ☐ | ☐ | ☒ | ☐ |
| Climbing Stairs | ☐ | ☐ | ☒ | ☐ |
| Climbing Ladders | ☐ | ☐ | ☐ | ☒ |
| Motor Vehicle Operation (automobile, forklift) | ☐ | ☐ | ☐ | ☒ |
| Travel (airplane, other) | ☐ | ☐ | ☐ | ☒ |

**Cognitive/Behavioral Abilities**

| | Frequent | Occasional | Seldom | Never |
|---|---|---|---|---|
| Financial/Statistical Analysis | ☐ | ☒ | ☐ | ☐ |
| Problem Solving | ☒ | ☐ | ☐ | ☐ |
| Formulation of New Ideas | ☐ | ☒ | ☐ | ☐ |
| Customer Relations (telephonically and/or in person) | ☒ | ☐ | ☐ | ☐ |
| Working Under Deadlines | ☒ | ☐ | ☐ | ☐ |
| Working on a Team | ☒ | ☐ | ☐ | ☐ |
| Working Alone | ☒ | ☐ | ☐ | ☐ |
| Supervising Others | ☐ | ☐ | ☐ | ☒ |
| Other (please specify as applicable to job) | ☐ | ☐ | ☐ | ☐ |

II.  Lifting Requirements *(check all that apply)*:

Ground to:    ☐ Knees    ☐ Waist    ☐ Shoulders    ☐ Overhead

Waist to:    ☒ Shoulders    ☐ Overhead

III.  Occupational Requirements *(check all that apply)*:

Senses:

☐ Far Vision   ☒ Near Vision   ☐ Peripheral Vision   ☐ Depth Perception   ☒ Hearing   ☒ Talking

*Repetitive Hand Use:*

☒ Simple Grasp   ☐ Twisting Motion  ☐ Fine Manipulation

*Personal Protective Equipment:* ☐ Safety Shoes   ☐ Respirator   ☐ Eye Protection   ☐ Ear Plugs   ☐ Gloves

☒ Other _____Ergonomic set up at his desk area (eg Chair, keyboard holder, etc.)

IV. Occupational Hazards *(check all that apply)*:

☐ Machine Operation   ☐ Vibration   ☐ Extreme Heat/Cold   ☐ Noise   ☒ Fumes/Gasses/Chemicals

☐ Vehicle Operation   ☐ Poor Lighting   ☐ Poor Ventilation   ☐ Dust   ☐ Other

Confidential
Admin Rec. 00574

Johnson & Johnson

## Job Analysis Worksheet

V.    Is there a potential for a temporary modified/alternate duty assignment prior to a full duty/hour return to work?   ☐ Yes   ☒ No

Note: Any modified/alternate duty opportunities will be discussed with you for approval prior to releasing the employee to return to work, and will include the specific restriction(s) and duration.

VI.   Additional Comments: _____

_____

_____

| _____Jose Rosado_____ | _____12/sep/08_____ | _____OCD Raritan, NJ |
|---|---|---|
| Name of Individual Completing Form | Date | Division/Location |
| _____QA Manager, Product Quality_____ | 908 218 8007_____ | 908 7043830____ |
| Signature and Title | Telephone No. | Fax No. |

## Upon Completion, Please Return to Reed Group via e-mail.
## ReturnToWellness@reedgroup.com

Page  2  of  2

Confidential
Admin Rec. 00575

 

15 Tech Valley Drive
Suite 3, Second Floor
East Greenbush, NY 12061

September 10, 2008

Ralph R Van Deventer Jr

Case #: 74518
WWID #: 10900

Dear Ralph Van Deventer Jr:

Thank you for contacting the Johnson & Johnson Return To Wellness Program.

Reed Group, the Administrator of the Johnson & Johnson STD Plan, will review the documentation you and/or your health care provider submit to determine whether your illness or injury makes you eligible, as defined by the Johnson & Johnson STD Plan, to receive STD benefits from your employer.

### Authorization to Release Medical Information

Upon receipt of documentation of illness or injury acceptable to our medical professionals at Reed Group, Johnson & Johnson's disability management administrator, you may be eligible to receive disability benefit payments from your employer. **Please remember that ultimately you are responsible for ensuring your health care provider provides the necessary medical information to the Reed Group Nurse Case Manager in order to be considered for STD benefits.** For your convenience, we have enclosed an Attending Physician's Statement. Please feel free to have your physician complete this form as it contains the necessary medical information to assist in the review of your short-term disability benefits. If you choose to use this form, please return to Reed Group via fax or in the enclosed business reply envelope.

### Reimbursement Agreement

Short Term Disability benefits will be offset or reduced by any other disability benefits you may receive such as Workers' Compensation, State Disability Plans, etc. Therefore, you are required to sign and return the enclosed Reimbursement Agreement form which states that you agree to repay the Johnson & Johnson any amount you receive in excess of the amount you would have been entitled to under the Plan. Failure to do so may result in the discontinuation of your benefit payments and reclaim from you any benefits already received.

### Attending Physician's Statement

For your convenience, we have enclosed an Attending Physician's Statement. Please feel free to have your physician complete this form as it contains the necessary medical information to assist in the initial review of your request for STD benefits. If you choose to use this form, please return to Reed Group via fax or in the enclosed business reply envelope.

It is important to note that should your initial request for STD benefits be approved and you require an extension or will not return to work on or before the authorization end date, it is your responsibility to ensure that you and/or your health care provider submits additional objective medical documentation to Reed Group five (5) days prior to the last authorized date to support your request. Examples of this objective medical documentation are:

- Physician office/progress notes

Confidential
Admin Rec. 00576

- Diagnostic test results (X-rays, MRI, etc.)
- Laboratory results
- Physical Therapy notes
- Medical Clearance from Disability

### Return to Work
If your health care provider releases you to return to work with temporary restrictions, they must complete the enclosed Release to Work (RTW) Form and submit it to Reed Group for review and final approval. When Reed Group has cleared you to return to work, please contact your Occupational Health Nurse to confirm if your company requires you to report to your Occupational Health department on the day you return to work.

### Family and Medical Leave
Since your injury/illness may also qualify as a serious medical condition under the Family Medical Leave Act (FMLA) this is a preliminary designation only of your FMLA leave. A disability leave for your own serious health condition will be counted towards FMLA once Reed Group determines that the eligibility criteria have been fulfilled. FMLA rules and regulations are outlined in the enclosed fact sheet as supplied by the US Department of Labor, Employment Standards Administration. You may also contact Reed Group to familiarize yourself with the provision of this federal law.

Per the Johnson & Johnson company policy, FMLA will run concurrent with any other leave for which the employee is eligible under Company policies, or federal, state, and local law. During any period of concurrent leave, the employee will receive the most generous protection available under the applicable laws or practices. No part of the Johnson & Johnson policy should negate a more generous benefit to which an employee may be entitled. If you have any questions, please contact Reed Group at 866-829-8861.

We wish you a safe and speedy recovery.



## AUTHORIZATION TO DISCLOSE AND USE MEDICAL INFORMATION
## FOR DISABILITY-RELATED DETERMINATIONS

Claimant's Full Name _____     Date of Birth: _____

Employer's Name: _____ Johnson & Johnson _____     Social Security Number (last 4 digits only): xxx-xx-_____

I authorize all doctors, hospitals, other health care providers, government agencies, insurers, employers, schools, training facilities, health plans, policyholders, contract holders, vendors, health and benefit plan administrators or their successors ("Records Holders") to give out my medical information as explained on this form.

This Information includes, but is not limited to, any records or facts about my medical condition, treatment, supplies, expenses, coverage or benefits, or my employment, vocation, education, training, or income, relating to my current disability or my ability to work, whether obtained prior to or after the date of this authorization ("Information").

Information may be provided to the following individuals or entities ("Benefit Managers"): the employer named above, Reed Group, their benefit plan or claims administrator(s), their related companies, contractors, investigators, attorneys, and service consultants, health care providers who treat or evaluate me with respect to my claim, and other individuals or entities involved in administering, evaluating, analyzing and managing the plan or my claim, to allow them to evaluate, analyze, manage and/or administer my claim for short term disability benefits, long term disability benefits, salary continuation, leave under the federal Family and Medical Leave Act, local and state leave laws, workers' compensation and/or any other health benefit program or leave benefit offered by and through my employer ("Benefits Program"), to support, defend, or review any determinations made with respect to the programs and benefits and to give my Information to any other person or entity if needed to find out whether I am eligible for benefits, to manage my claim under a Benefits Program, or to run a Benefits Program. The Benefits Managers will tell those receiving the Information that the Information is confidential.

I understand that once my Information is given out as authorized in this form, federal privacy laws may not protect it. Benefits Managers may give Information out again as described in this form.

I understand that this permission lasts twelve (12) months after my claim and all appeals are processed or twelve (12) months after the end of my coverage or benefits under the Benefits Program, whichever is longer, unless the law requires a shorter period. If I change my mind before that time, I can tell Reed Group in writing that I do not want Record Holders or Benefit Managers to share any more information. If I write to stop them from sharing information, it will not change any actions they took before they receive my letter.

If I do not sign this form, it will not affect how my health care providers treat me. However, if I do not sign, the Benefits Managers may not be able to review my claim and find out whether I am eligible for benefits. This may result in the delay or denial of my request for benefits.

The Information released under this authorization can be sent electronically, by phone or fax, or by mail. I know I can see or request a copy of the records given to the Benefits Managers. I agree that a copy of this form may be treated as a signed original. I understand the terms of this form.

_____     _____
Claimant's or Legal Representative's Signature     Date

_____     _____
Legal Representative's Name (if any)     Legal Representative's Relationship

The person or entity disclosing the Information is responsible for deciding whether to accept this authorization form and, on acceptance, shall send a copy to the claimant.

**Please Fax to Reed Group at 518-880-6610 or return by mail in the enclosed business reply envelope**

Confidential
Admin Rec. 00578



# ATTENDING PHYSICIAN'S STATEMENT

*NOTE TO PHYSICIAN OR OTHER HEALTH CARE PROVIDER: Your full completion of this form is necessary so that the employee's application for benefit may be received and processed. PLEASE ANSWER ALL QUESTIONS. RETURN FORM TO REED GROUP PROMPTLY to 15 Tech Valley Drive, 2nd Floor, Suite 3, East Greenbush, NY 12061. Fax (518) 880-6610.*

| | |
|---|---|
| Patient's Full Name: | Date of birth: |

| | |
|---|---|
| Date symptoms first appeared or accident happened? | Date patient first consulted you for this condition: |

| | |
|---|---|
| Is condition due to injury or sickness arising out of patient's employment?  ☐ Yes ☐ No<br>If "Yes", please explain: | Is condition due to pregnancy?<br>☐ Yes ☐ No<br>If "Yes", expected date of delivery: _____ |

| | |
|---|---|
| Primary Diagnosis: | Primary ICD Code (if available): |
| Secondary diagnosis: | Secondary ICD Code (if available): |

Treatment Plan: detail the complete treatment plan (including therapy or referrals to other specialists):

State the surgical, obstetrical, or other diagnostic or therapeutic procedures requires, if any (Describe fully)
Procedure: _____

Date(s) Performed: _____  ☐ Inpatient ☐ Outpatient

Hospital Name: _____  Admission Date: _____  Discharge Date: _____

Medications: List all prescribed medications including Name, Dose, Frequency, and Start Date

Office Visits: Date of Last Visit_____  Date of Next Scheduled Visit: _____

| | |
|---|---|
| Functional Status: Has Patient been totally unable to work?<br>☐ Yes, From: _____ Through: _____<br>☐No | What are the Functional Limitations that currently prevent the patient from working in any capacity? |

| | |
|---|---|
| Estimated Return to Work Date:<br>Modified Hours and/or duty date: _____<br>Full hours/duty date: _____ | State any restrictions and/or accommodations which may be needed for modified duty and duration thereof: |

| | | | |
|---|---|---|---|
| Name of referring physician (if applicable): | Referring physician's telephone number: | | |
| Address - Street: | City: | State: | Zip Code: |
| Physician's full name/Specialty (please print): | Physician's telephone number: | | |
| Address - Street: | City: | State: | Zip Code: |
| Attending physician's signature: | Date: | | |

Confidential
Admin Rec. 00579

 

## REIMBURSEMENT AGREEMENT
### SHORT TERM DISABILITY PLAN

# EMPLOYEE STATEMENT

| Name: | Social Security Number: | | Date of Birth: |
|---|---|---|---|
| Address - Street: | City: | State: | Zip Code: |
| Home Telephone Number: | Employee's Home E-mail Address (if available): | | |

I am familiar with and understand the provisions of the Short Term Disability Plan for Eligible Employees of Johnson & Johnson and Affiliated Companies (the "Plan") that require that monthly payments to me will be reduced by certain amounts, such as state disability insurance (where applicable) and workers' compensation benefits. I understand that these reductions may sometimes be based on a reasonable estimate of the amount of other benefits that will be paid to me. I agree to these reductions.

I further understand and agree that I am required to repay Johnson & Johnson for any overpayments that have been made to me, including, without limitation, payments that have not been offset (or offset fully) for retroactive awards of state disability insurance, workers' compensation or other relevant benefits, as described under the terms of the Plan, and that I am required to pay the Plan any amounts that I recover from a third party in connection with my disability to the extent provided under the terms of the Plan. I agree to make these payments promptly, in accordance with the terms of the Plan. I understand and agree to the terms of the Plan regarding other rights of the Plan to recover amounts through subrogation and third party reimbursement.

I further agree to notify the Reed Group immediately upon my receiving notice that I have or will receive any amounts that offset my benefits under the Plan or any amounts that oblige me to pay or repay any amount to the Plan.

| Employee's Signature: | Date: |
|---|---|
| Witness Signature: | Date: |

## Please <u>Fax</u> to 518-880-6610 or <u>Mail</u> to the Address Listed Above

Confidential
Admin Rec. 00580

 

## Release to Work Form

Instructions:  Prior to returning to work from a Short Term Disability (STD) Leave with **temporary restrictions**, you **MUST** fax this form to Reed Group at 518-880-6610 for approval.

If you have any questions, please call 866-829-8861

### Part I – To be completed by Employee

Employee Name: (Please Print)

Worldwide ID #:

### Part II - To be completed by Medical Provider – Please do NOT list diagnosis or nature of illness/injury

I certify that this employee is medically fit to return to work on (date): _____

The employee's medical condition ☐ will (Please complete Part III) OR ☐ **will not** (skip to Part V) continue to impact his/her ability to perform all of the regular functions of his/her position.

If temporary accommodation(s) are necessary, the projected full duty release is (date): _____

### Part III – Abilities – To be completed by Medical Provider

| Identify appropriate work level for employee's condition: | ACTIVITY | NONE | OCCASIONALLY (1 to 3 hours) | FREQUENTLY (3 to 6 hours) | CONTINUOUSLY (6 + Hours) |
|---|---|---|---|---|---|
| ☐ SEDENTARY WORK – Sitting most of the time; brief periods walk/stand; lift up to 10 lbs. occasionally | Stand/Walk | ☐ | ☐ | ☐ | ☐ |
| | Sit | ☐ | ☐ | ☐ | ☐ |
| ☐ LIGHT WORK – Significant degree of walking/standing; some sitting; lift - up to 20 lbs. occasionally | Drive | ☐ | ☐ | ☐ | ☐ |
| | Bend | ☐ | ☐ | ☐ | ☐ |
| ☐ MEDIUM WORK – Lift up to 50 lbs. occasionally; 20 lbs. frequently; 10 lbs. constantly | Twist | ☐ | ☐ | ☐ | ☐ |
| | Squat | ☐ | ☐ | ☐ | ☐ |
| ☐ HEAVY WORK – Lift up to 100 lbs. occasionally; 50 lbs. frequently; 20 lbs. constantly | Climb | ☐ | ☐ | ☐ | ☐ |
| | Grasp | ☐ | ☐ | ☐ | ☐ |
| ☐ VERY HEAVY WORK – Lifting in excess of 100 lbs. occasionally; 50 lbs. frequently; 20 lbs. constantly | Push/Pull | ☐ | ☐ | ☐ | ☐ |
| | Reach | ☐ | ☐ | ☐ | ☐ |

### Part IV – Temporary Restrictions

This employee may return to work with the following temporary restrictions:

RESTRICTION                     DATE RESTRICTION BEGINS        DATE RESTRICTION ENDS

_____                 _____                _____

_____                 _____                _____

_____                 _____                _____

RTW Form – Page 1 of 2

**Part V – Safe Operation of a Company Vehicle (to be completed by Health Care Provider, if applicable)**

Individuals who operate a company vehicle (Sales Representative, forklift operators, etc.) are considered to be in a Safety Sensitive position. If the above named individual is required to operate a company vehicle as part of their responsibilities, please complete this section.

Please check one:

_____ The above named individual's medical condition/status <u>does not interfere</u> with his/her ability to operate a company vehicle.

_____ The above named individual's medical condition/status <u>does not interfere</u> with his/her ability to operate a company vehicle <u>with the accommodations/ restrictions described below</u>

_____ The above named individual's medical condition/status <u>does interfere</u> with his/her ability to drive and cannot operate a company vehicle at this time.

Accommodations/Restrictions including duration:

_____

_____

_____

**Part VI – Use of Fitness Center**

Use of the Fitness Center: Johnson & Johnson sponsors a health promotion program for employees. One component of this program is an exercise program that includes aerobic, strength and/or flexibility training.

1. This employee may participate in aerobic, strength and flexibility training without restrictions:

[ ] YES    [ ] NO, then please complete next statement

2. This employee may participate in aerobic, strength and flexibility training with the following restrictions:

_____

_____

**Part VII – Medical Provider Information**

| Attending Physician's Name: (Please Print) | Attending Physician's Phone Number: |
|---|---|
| Attending Physician's Signature: | Date: |

## Please fax to 518-880-6610 when complete

RTW Form – Page 2 of 2

# EMPLOYMENT STANDARDS ADMINISTRATION

Wage and Hour Division Fact Sheet No. 028

## THE FAMILY AND MEDICAL LEAVE ACT OF 1993

The U.S. Department of Labor's Employment Standards Administration, Wage and Hour Division, administers and enforces the Family and Medical Leave Act (FMLA) for all private, state and local government employees, and some federal employees. Most Federal and certain congressional employees are also covered by the law and are subject to the jurisdiction of the U.S. Office of Personnel Management or the Congress.

FMLA became effective on August 5, 1993, for most employers. If a collective bargaining agreement (CBA) was in effect on that date, FMLA became effective on the expiration date of the CBA or February 5, 1994, whichever was earlier. FMLA entitles eligible employees to take up to 12 weeks of unpaid, job-protected leave in a 12-month period for specified family and medical reasons. The employer may elect to use the calendar year, a fixed 12-month leave or fiscal year, or a 12-month period prior to or after the commencement of leave as the 12-month period.

The law contains provisions on employer coverage; employee eligibility for the law's benefits; entitlement to leave, maintenance of health benefits during leave, and job restoration after leave; notice and certification of the need for FMLA leave; and, protection for employees who request or take FMLA leave. The law also requires employers to keep certain records.

## EMPLOYER COVERAGE

FMLA applies to all:

- public agencies, including state, local and federal employers, local education agencies (schools), and

- private-sector employers who employed 50 or more employees in 20 or more workweeks in the current or preceding calendar year and who are engaged in commerce or in any industry or activity affecting commerce — including joint employers and successors of covered employers.

## EMPLOYEE ELIGIBILITY

To be eligible for FMLA benefits, an employee must:

1. work for a covered employer;
2. have worked for the employer for a total of 12 months;
3. have worked at least 1,250 hours over the previous 12 months; and
4. work at a location in the United States or in any territory or possession of the United States where at least 50 employees are employed by the employer within 75 miles.

## LEAVE ENTITLEMENT

A covered employer must grant an eligible employee up to a total of 12 workweeks of unpaid leave during any 12-month period for one or more of the following reasons:

- for the birth and care of the newborn child of the employee;

- for placement with the employee of a son or daughter for adoption or foster care;

- to care for an immediate family member (spouse, child, or parent) with a serious health condition; or

- to take medical leave when the employee is unable to work because of a serious health condition.

Spouses employed by the same employer are jointly entitled to a combined total of 12 work-weeks of family leave for the birth and care of the newborn child, for placement of a child for adoption or foster care, and to care for a parent who has a serious health condition.

Leave for birth and care, or placement for adoption or foster care must conclude within 12 months of the birth or placement.

Under some circumstances, employees may take FMLA leave intermittently — which means taking leave in blocks of time, or by reducing their normal weekly or daily work schedule.

- If FMLA leave is for birth and care or placement for adoption or foster care, use of intermittent leave is subject to the employer's approval.

- FMLA leave may be taken intermittently whenever medically necessary to care for a seriously ill family member, or because the employee is seriously ill and unable to work.

Also, subject to certain conditions, employees or employers may choose to use accrued paid leave (such as sick or vacation leave) to cover some or all of the FMLA leave.

The employer is responsible for designat an employee's use of paid leave counts a FMLA leave, based on information from employee.

"Serious health condition" means an ill injury, impairment, or physical or mental condition that involves either:

- any period of incapacity or treatment connected with inpatient care (i.e., an overnight stay) in a hospital, hospice, residential medical-care facility, and a period of incapacity or subsequent tre in connection with such inpatient care

- Continuing treatment by a health care provider which includes any period of incapacity (i.e., inability to work, atten school or perform other regular daily activities) due to:

1. A health condition (including treatme therefor, or recovery therefrom) lasti more than three consecutive days, a any subsequent treatment or period incapacity relating to the same cond that also includes:

- treatment two or more times by or und supervision of a health care provider;

- one treatment by a health care provide a continuing regimen of treatment; or

2. Pregnancy or prenatal care. A visit t health care provider is not necessar each absence; or

3. A chronic serious health condition w continues over an extended period c time, requires periodic visits to a hea care provider, and may involve occasional episodes of incapacity (e asthma, diabetes). A visit to a health provider is not necessary for each absence; or

4. A permanent or long-term condition which treatment may not be effective (e.g., Alzheimer's, a severe stroke, terminal cancer). Only supervision b health care provider is required, rath than active treatment; or

5. Any absences to receive multiple treatments for restorative surgery or condition which would likely result in period of incapacity of more than thr days if not treated (e.g., chemothera radiation treatments for cancer).

Confidential
Admin Rec. 00583

"Health care provider" means:

- doctors of medicine or osteopathy authorized to practice medicine or surgery by the state in which the doctors practice; or

- podiatrists, dentists, clinical psychologists, optometrists and chiropractors (limited to manual manipulation of the spine to correct a subluxation as demonstrated by X-ray to exist) authorized to practice, and performing within the scope of their practice, under state law; or

- nurse practitioners, nurse-midwives and clinical social workers authorized to practice, and performing within the scope of their practice, as defined under state law; or

- Christian Science practitioners listed with the First Church of Christ, Scientist in Boston, Massachusetts; or

- Any health care provider recognized by the employer or the employer's group health plan benefits manager.

## MAINTENANCE OF HEALTH BENEFITS

A covered employer is required to maintain group health insurance coverage for an employee on FMLA leave whenever such insurance was provided before the leave was taken and on the same terms as if the employee had continued to work. If applicable, arrangements will need to be made for employees to pay their share of health insurance premiums while on leave.

In some instances, the employer may recover premiums it paid to maintain health coverage for an employee who fails to return to work from FMLA leave.

## JOB RESTORATION

Upon return from FMLA leave, an employee must be restored to the employee's original job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment.

In addition, an employee's use of FMLA leave cannot result in the loss of any employment benefit that the employee earned or was entitled to before using FMLA leave, nor be counted against the employee under a "no fault" attendance policy.

Under specified and limited circumstances where restoration to employment will cause substantial and grievous economic injury to its

operations, an employer may refuse to reinstate certain highly-paid "key" employees after using FMLA leave during which health coverage was maintained. In order to do so, the employer must:

- notify the employee of his/her status as a "key" employee in response to the employee's notice of intent to take FMLA leave;

- notify the employee as soon as the employer decides it will deny job restoration, and explain the reasons for this decision;

- offer the employee a reasonable opportunity to return to work from FMLA leave after giving this notice; and

- make a final determination as to whether reinstatement will be denied at the end of the leave period if the employee then requests restoration.

A "key" employee is a salaried "eligible" employee who is among the highest paid ten percent of employees within 75 miles of the work site.

## NOTICE AND CERTIFICATION

Employees seeking to use FMLA leave are required to provide 30-day advance notice of the need to take FMLA leave when the need is foreseeable and such notice is practicable.

Employers may also require employees to provide:

- medical certification supporting the need for leave due to a serious health condition affecting the employee or an immediate family member;

- second or third medical opinions (at the employer's expense) and periodic recertification; and

- periodic reports during FMLA leave regarding the employee's status and intent to return to work.

When intermittent leave is needed to care for an immediate family member or the employee's own illness, and is for planned medical treatment, the employee must try to schedule treatment so as not to unduly disrupt the employer's operation.

Covered employers must post a notice approved by the Secretary of Labor explaining rights and responsibilities under FMLA. An employer that willfully violates this posting requirement may be subject to a fine of up to $100 for each separate offense.

Also, covered employers must inform employees of their rights and responsibilities under FMLA, including giving specific written information on what is required of the

employee and what might happen in certain circumstances, such as if the employee fails to return to work after FMLA leave.

## UNLAWFUL ACTS

It is unlawful for any employer to interfere with, restrain, or deny the exercise of any right provided by FMLA. It is also unlawful for an employer to discharge or discriminate against any individual for opposing any practice, or because of involvement in any proceeding, related to FMLA.

## ENFORCEMENT

The Wage and Hour Division investigates complaints. If violations cannot be satisfactorily resolved, the U.S. Department of Labor may bring action in court to compel compliance. Individuals may also bring a private civil action against an employer for violations.

## OTHER PROVISIONS

Special rules apply to employees of local education agencies. Generally, these rules provide for FMLA leave to be taken in blocks of time when intermittent leave is needed or the leave is required near the end of a school term.

Salaried executive, administrative, and professional employees of covered employers who meet the Fair Labor Standards Act (FLSA) criteria for exemption from minimum wage and overtime under Regulations, 29 CFR Part 541, do not lose their FLSA-exempt status by using any unpaid FMLA leave. This special exception to the "salary basis" requirements for FLSA's exemption extends only to "eligible" employees' use of leave required by FMLA.

The FMLA does not affect any other federal or state law which prohibits discrimination, nor supersede any state or local law which provides greater family or medical leave protection. Nor does it affect an employer's obligation to provide greater leave rights under a collective bargaining agreement or employment benefit plan. The FMLA also encourages employers to provide more generous leave rights.

## FURTHER INFORMATION

The final rule implementing FMLA is contained in the January 6, 1995,

Confidential
Admin Rec. 00584

Federal Register. For more information, please contact the nearest office of the Wage and Hour Division, listed in most telephone directories under U.S. Government, Department of Labor.

Confidential
Admin Rec. 00585



15 Tech Valley Drive
Suite 3, Second Floor
East Greenbush, NY 12061

To:     Johnson and Johnson

From:  Reed Group

Re:     Request for Disability Absence and/or Family Medical Leave (FMLA)

Please be advised that Ralph R Van Deventer Jr submitted a leave request to Reed Group on 8/9/2008 for STD FMLA due to Employee Serious Health Condition (Case # - 74518)

The first date of absence reported is 9/8/2008.

According to the employee's hire date and the eligibility information provided by Johnson and Johnson, this employee is:

☒     Eligible for FMLA

☐     Not eligible for FMLA

**\*\*Please note:  This employee is not approved for FMLA.  You will be notified of our determination upon receipt of validation of medical criteria.\*\***

JJFML01 - FMLA Eligibility Notification .doc

Confidential
Admin Rec. 00586

at is the FMLA?

ible employees who work for companies that employ
or more people, including our company, are entitled
er federal law to unpaid leave under certain
ditions. The Family and Medical Leave Act (FMLA)
 employees who qualify take up to 12 workweeks of
/e during the course of a 12-month period without the
 of losing their jobs as long as the leave is for
cified family or serious illness-related reasons. This
nphlet explains how the FMLA works and what your
: is in the process.

ase note that the FMLA is a complex law and that you
y run into a situation that is not addressed in this
nphlet.    Whenever that happens, you should
nediately contact HR and/or legal for guidance. You
) need to be aware that a number of states have mini-
LA laws that could apply, depending on where we do
:iness.

iich Employees Are Eligible for FMLA Leave?

 qualify for FMLA leave, an employee has to meet
tain eligibility requirements.  As a general rule, she or

Must have worked for the company for at least 12
nonths (these do not have to be consecutive months);
nd
Must have "worked" at least 1,250 hours over the 12-
nonth period prior to the start of  FMLA        leave.
/acation and sick time generally do not count for
purposes of adding up hours "worked".

ien Does an Eligible Employee Qualify To Take
ILA Leave?

 eligible employee can qualify for FMLA leave for one
more of the following reasons:

- ⊃ birth of a newborn child up to the age of one
  🜂th the mother and father
  r this bonding leave.
- ⊃lacement with the employee of a child for
  ⊃ or foster care up to one year
  ↄ the adoption or placement.  Both men and
  also qualify for this kind of

  for an immediate family member (defined to
  ⸱e employee's spouse, parent, or child)

---

with a serious health condition.
- For the employee's own serious health condition when
  it prevents the employee from working.

What Is a Serious Health Condition?

The FMLA defines "serious health condition" very
broadly.   It  can  include  both  long-term  illnesses
(conditions which cause absences lasting more than three
days) and short-term illnesses (in some cases, an illness
that lasts less than a day).  Even the flu or a migraine
headache could be a serious health condition in some
cases.  The following examples all likely put you on notice
that  an  FMLA-qualifying  serious  health  condition  is
involved:

- An  eligible  employee  reports  that  he  has  had  an
  overnight hospital stay.
- An  eligible  employee  reports  that  she  has  seen  her
  doctor and been told to stay home
  for four days and take some prescription medication.
- An  eligible  employee  needs  to  go  for  a  visit  to  a  nurse
  practitioner  for  prenatal  care  or  come  in  late  due  to
  severe morning sickness.
- An  eligible  employee  has  periodic  absences  due  to  a
  child's asthma attacks.
- An  eligible  employee  needs  leave  to  care  for  a  parent
  with rheumatoid arthritis.
- An  eligible  employee  needs  leave  to  take  his  or  her
  spouse for physical therapy following a back operation.

Is an Eligible Employee Required To Give Advance
Notice of the Need To Take FMLA Leave?

If  the  need  for  FMLA  leave  is  unforeseeable,  the
employee only must give notice "as soon as practicable,"
which  can  be  up  to  two  business  days  from  when  the
employee realizes that he or she needs to take leave.  If
the need for FMLA leave is foreseeable, such as where
the employee is going to have a baby or where he or she
is having scheduled surgery, the employee must give 30
days notice.  If a failure to give notice issue arises, you
should immediately consult with HR.

Does an Eligible Employee Have To Take All of His or
Her FMLA Leave in One Block?

Generally, no.  Although an eligible employee has the
right to take up to all 12 weeks of FMLA leave

---

at once, the law also permits the employee to take leave
on an intermittent basis or reduced leave schedule (e.g.,
part-time work) if it is medically necessary.  If the
employee  requests  intermittent  or  reduced  schedule
leave, we can ask (but not require) the employee to
attempt to schedule the leave so that it does not disrupt
our business operations.  In cases following the birth or
adoption of a child, an employee can take leave on an
intermittent or reduced leave basis only if we agree.

What Other Rights Does the FMLA Give To an Eligible
Employee?

In addition to the entitlement to unpaid leave, the FMLA
gives eligible employees:

- The right to be reinstated to the job the employee had
  prior to going on FMLA leave (assuming the employee
  can still perform the job).
- The right to the continuation of health benefits while
  on FMLA leave.
- The  right  to  be  free  from  discipline  based  on  an
  attendance policy if the absences are protected FMLA
  leave.
- The right to be free from retaliation or harassment for
  taking FMLA leave.

Does an Eligible Employee Have To Specifically
Request "FMLA Leave"?

No.  The law requires an eligible employee to provide
enough information to put us on notice that she or he
needs FMLA leave.   The law does not require the
employee to specifically tell us that they need to take
"FMLA leave."  Instead, we are on notice when the
information that the employee provides is enough to
identify an FMLA qualifying reason.

Can We Ask an Eligible Employee To Document an
FMLA Leave Request?

Generally, yes.  An employer is allowed to request
reasonable documentation if the employee requests or
puts us on notice of the need for FMLA leave.  In the case
of the birth or adoption of a child, or placement for foster
care, this may be a birth certificate or court document.
We can also request reasonable documentation that
shows a family member is in fact a parent, spouse or
child.

If the need for FMLA leave is because of a serious health
condition involving the employee or a close

Admin Rec. 00687
Confidential

family member, we can ask the employee to have his or her health care provider complete a "medical certification" form. Please note that health care providers can include providers such as psychologists and clinical social workers in addition to doctors and nurses.

**What Should I Do If I Think an Absence May Qualify Under the FMLA?**

It is important that you notify HR at once, because the law places strict timelines on notifying employees about their rights under the FMLA. For example, we are required to tell an eligible employee that the leave is FMLA-qualifying within two business days after we're put on notice. If we do not make an FMLA leave designation in a timely manner, any leave time taken prior to when we give proper notice may not count towards the employee's FMLA leave entitlement, nor can it be counted towards the employee's attendance record.

**Who Has the Responsibility To Keep Track of How Much FMLA Leave the Employee Uses?**

It is our responsibility. As an employer, we must track what absences count towards an eligible employee's total FMLA leave entitlement. We are not allowed to count more leave than the amount the employee actually uses. Therefore, if an employee only uses an hour of FMLA leave on a given day, we may only count an hour towards the total amount of FMLA leave that the employee is entitled to.

**Can an Eligible Employee Use Accrued Paid Sick or Vacation Leave While on FMLA Leave?**

If an employee has paid sick or vacation leave available, in certain cases he or she can have the paid leave run concurrently with unpaid FMLA leave. As an employer, we also have the right to require an employee to use accrued paid leave while they are taking unpaid FMLA leave in certain circumstances. You should contact HR for our company's policy on the use of substituting paid

**Can We Contact an Employee on FMLA Leave About Coming Back To Work or About Work-Related Matters?**

We can ask the employee to provide periodic status reports as to the employee's intent to return to work. We should not routinely contact the employee with regard to work-related matters while the employee is on FMLA leave.

**What Can We Do If We Believe the Employee Is Abusing the System and Doesn't Really Need FMLA Leave?**

If the employee provides the appropriate documentation, the employee is entitled to FMLA leave. The law does allow us to ask the employee to provide re-certification for the need for FMLA leave in certain circumstances, including in cases where the employer receives information to cast doubt on the validity of the information initially provided or where circumstances have changed. If we conclude that an employee fraudulently is taking FMLA leave, we can take disciplinary action against the employee in the same manner as we take disciplinary action against any employee who provides us with fraudulent information. You should always check with HR before accusing an employee of fraudulently taking FMLA leave.



What Supervisors Should Know About

The Family

And

Medical Leave

Act (FMLA)

Confidential
Admin. Rec. 00588

# Initial Notification Email Template

## Initial Notification

| Name: | Ralph R Van Deventer Jr |
|---|---|
| WWID#: | 10900 |
| Case Number: | 74518 |
| First Day Absent: | 9/8/2008 |

In order to facilitate a safe and timely return to work for this employee, please complete the enclosed Job Analysis form and return to Reed Group via e-mail within two (2) business days following the receipt of this notification. The e-mail address is ReturnToWellness@reedgroup.com. In addition, please provide any pertinent information regarding this claimant that you feel might impact the disability management process.

I will follow up with a benefit determination. Please email me if you have any questions regarding this claim.

Please include either the employee's name or case number in the subject line of your e-mail.

Thank You
Cindy Haverly
Assigned Case Manager

Confidential
Admin Rec. 00589

## Johnson & Johnson

## Job Analysis Worksheet

*(To be Completed by Employee's Immediate Supervisor)*

Employee: Ralph R Van Deventer Jr    Absence ID#: 74518    Job Title: _____

Days Worked Per Week: _____    No. of Hours Per Day: _____ Overtime required? ☐ YES ☐ NO

Brief description of Job Duties: _____

_____

_____

**Frequent = 67% - 100%    Occasional = 34% - 66%    Seldom = 1% - 33%    Never = 0%**

I. Using the above guidelines, please rate each of the following activities as *Frequent, Occasional, Seldom, or Never:*

### Physical Abilities

| | Frequent | Occasional | Seldom | Never |
|---|---|---|---|---|
| **Lifting/Carrying** | | | | |
| 1 – 10 lbs. | ☐ | ☐ | ☐ | ☐ |
| 11 – 25 lbs. | ☐ | ☐ | ☐ | ☐ |
| 26 – 50 lbs. | ☐ | ☐ | ☐ | ☐ |
| 51 – 100 lbs. | ☐ | ☐ | ☐ | ☐ |
| Pushing | ☐ | ☐ | ☐ | ☐ |
| Pulling | ☐ | ☐ | ☐ | ☐ |
| Reaching | ☐ | ☐ | ☐ | ☐ |
| Overhead Work | ☐ | ☐ | ☐ | ☐ |
| Sitting | ☐ | ☐ | ☐ | ☐ |
| Standing | ☐ | ☐ | ☐ | ☐ |
| Walking | ☐ | ☐ | ☐ | ☐ |
| Kneeling | ☐ | ☐ | ☐ | ☐ |
| Climbing Stairs | ☐ | ☐ | ☐ | ☐ |
| Climbing Ladders | ☐ | ☐ | ☐ | ☐ |
| Motor Vehicle Operation (automobile, forklift) | ☐ | ☐ | ☐ | ☐ |
| Travel (airplane, other) | ☐ | ☐ | ☐ | ☐ |

### Cognitive/Behavioral Abilities

| | Frequent | Occasional | Seldom | Never |
|---|---|---|---|---|
| Financial/Statistical Analysis | ☐ | ☐ | ☐ | ☐ |
| Problem Solving | ☐ | ☐ | ☐ | ☐ |
| Formulation of New Ideas | ☐ | ☐ | ☐ | ☐ |
| Customer Relations (telephonically and/or in person) | ☐ | ☐ | ☐ | ☐ |
| Working Under Deadlines | ☐ | ☐ | ☐ | ☐ |
| Working on a Team | ☐ | ☐ | ☐ | ☐ |
| Working Alone | ☐ | ☐ | ☐ | ☐ |
| Supervising Others | ☐ | ☐ | ☐ | ☐ |
| Other (please specify as applicable to job) | ☐ | ☐ | ☐ | ☐ |

II. Lifting Requirements *(check all that apply):*

     Ground to:    ☐ Knees    ☐ Waist    ☐ Shoulders    ☐ Overhead

     Waist to:    ☐ Shoulders    ☐ Overhead

III. Occupational Requirements *(check all that apply):*

     *Senses:*

     ☐ Far Vision    ☐ Near Vision    ☐ Peripheral Vision    ☐ Depth Perception    ☐ Hearing    ☐ Talking

     *Repetitive Hand Use:*

     ☐ Simple Grasp    ☐ Twisting Motion    ☐ Fine Manipulation

     *Personal Protective Equipment:* ☐ Safety Shoes    ☐ Respirator    ☐ Eye Protection    ☐ Ear Plugs    ☐ Gloves

     ☐ Other _____

IV. Occupational Hazards *(check all that apply):*

     ☐ Machine Operation    ☐ Vibration    ☐ Extreme Heat/Cold    ☐ Noise    ☐ Fumes/Gasses/Chemicals

     ☐ Vehicle Operation    ☐ Poor Lighting    ☐ Poor Ventilation    ☐ Dust

Confidential
Admin Rec. 00590

Johnson & Johnson

## Job Analysis Worksheet

V.  Is there a potential for a temporary modified/alternate duty assignment prior to a full duty/hour return to work?  ☐ Yes   ☐ No

Note: Any modified/alternate duty opportunities will be discussed with you for approval prior to releasing the employee to return to work, and will include the specific restriction(s) and duration.

VI.  Additional Comments: _____

_____

_____

| Name of Individual Completing Form | Date | Division/Location |
|---|---|---|

| Signature and Title | Telephone No. | Fax No. |
|---|---|---|

## Upon Completion, Please Return to Reed Group via e-mail, ReturnToWellness@reedgroup.com

Confidential
Admin Rec. 00591

# Initial Notification Email Template

## Initial Notification

| Name: | Ralph R Van Deventer Jr |
|---|---|
| WWID#: | 10900 |
| Case Number: | 74518 |
| First Day Absent: | 09/08/2008 |
| Primary Diagnosis: | Arthropathy, Unspecified; Arthritis, Acute, Chronic, Subacute; Articular Rheumatism; Inflammation of Joint, NOS |
| ICD-9 Code: | 716.9 |
| Secondary Diagnosis: | |
| ICD-9 Code: | |

Please provide any pertinent information regarding this claimant that you feel might impact the disability management process.

I will follow up with a benefit determination. Please email me at ReturnToWellness@reedgroup.com if you have any questions regarding this claim. Please include either the employee's name or case number in your e-mail.

Thank You
Judy Wheeler
Assigned Case Manager

Confidential
Admin Rec. 00592

*Johnson & Johnson*

October 4, 2010

**VIA CERTIFIED MAIL**

Stephen Roger Bosin
70 Grand Avenue
River Edge, NJ 07661

Re:   **Final Appeal Determination Update**: Claim for Benefits under the Long Term
      Disability (LTD) Income Plan for Choices Eligible Employees of Johnson & Johnson and
      Affiliated Companies (the "Plan") – Ralph R. Van Deventer, Jr.

Dear Mr. Bosin:

We are in receipt of your letter dated August 24, 2010, which was received on August 27, 2010,
and in which you made a final appeal for continued LTD benefits under the Plan, on behalf of
your client, Ralph R. Van Deventer, Jr..

We have had the opportunity to preliminarily consider Mr. Van Deventer's claim appeal, and
determined that in order to conduct a full and fair review of his appeal, we require a clinical
assessment of his claim file, including all documentation received during the appeal process.

As you probably know the initial 45-day period for our consideration of Mr. Van Deventer's
appeal was to expire on October 13, 2010.  We anticipate requiring no more than 35 days of the
45-day extension period permitted under the Plan.  Therefore, the period for our consideration of
Mr. Van Deventer's claim appeal will expire on November 17, 2010, and he can expect a final
determination at that time.

Thank you for your patience in this matter.

Very truly yours,

Richard McDonald, Director
Corporate Benefits
For the Johnson & Johnson Pension Committee

cc: Natalie Madrid, Reed Group

Confidential
Admin Rec. 00593

**Kevin L. Trangle, MD, MBA, FACOEM, FACPM, FAADEP, BCIM, ABIME, CIME, CMRO**



Parkway Medical Center
3609 Park East Drive, Suite 202 North
Beachwood, OH 44122
Telephone: (216) 504-0400
Fax: (216) 504-0404
Email: ktrangle@mdimex.com

## INDEPENDENT MEDICAL RECORD REVIEW AND REPORT

| NAME: | Ralph Van Deventer, Jr. | DATE OF BIRTH: | ▬▬▬▬▬ |
|---|---|---|---|
| LAST DAY OF WORK: | 09/08/2008 | DATE OF REPORT: | 11/03/2010 |
| EMPLOYER: | Johnson & Johnson | WWID NUMBER: | 10900 |
| ABSENCE ID NUMBER: | 74518 | | |

LAST DATE OF BENEFITS:   03/10/2010

PURPOSE OF REVIEW:  Determination of Long-Term Disability Status

MEDICAL SPECIALTY OF EXAMINER: Occupational Medicine/Internal Medicine

REQUESTING PARTY:  Johnson & Johnson

I had the opportunity of performing a medical record review for the purpose of an Independent Medical Evaluation, and for evaluation purposes only.  The patient was neither seen nor examined.

If more information becomes available at a later date, an additional service report and/or reconsideration may be requested.  Such information may or may not change the opinion rendered in this evaluation.

I have been asked to determine if Mr. Ralph Van Deventer, Jr., meets the definition of "Total Disability" under the plan standard as of 10/12008. "Totally Disabled" is defined as:

*During the remainder, if any, of the period of disability, the complete inability of the Participant, due to Sickness or Injury, to perform any job for which the Participant is (or may reasonably become) with or without reasonable accommodation qualified by training, education or experience.*

Confidential
Admin Rec. 00594

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 2

HISTORY:

Mr. Van Deventer is a 52-year-old man with history of chronic low back pain. In 1979, the claimant had history of back injury while working in the ski patrol with the United States Army. In June 2008, the claimant reported exacerbation of his back injury, and medical records reviewed, revealed a left Achilles tendon injury in May 2008.

Mr. Van Deventer's low back pain progressed to the extent that he remained out of work from May until July 2009. He was seen by an orthopedic surgeon who prescribed him treatment including a course of physical therapy with modalities; despite treatment the pain did not subside.

On 11/13/2008, the claimant underwent a MRI scan of the lumbosacral spine which revealed diffuse facet degenerative changes.

On 01/13/2009, a psychiatric note by Dr. Rajput noted that the claimant had been receiving psychiatric treatment since 9/17/2008 for depression and anxiety.

An orthopedic Independent Medical Examination by Dr. Norman Heyman note dated 01/13/2009 indicated that the claimant had lumbosacral sprain and strain, lumbar syndrome mechanical in nature, and degenerative Achilles tendinitis on the left side. The review concluded the following: Mr. Van Deventer's condition was chronic, the condition was partially preventing him from functioning, he was capable of performing his current job in the sedentary position, and he was capable of working eight hours per day with frequent breaks. Finally, Dr. Heyman disagreed that the claimant needed to wear a boot; instead he should be put in a shoe with a heel pad to elevate his posterior foot.

On 01/26/2009, the claimant received pain management treatment with Dr. Carmen Quinones. The note disclosed the claimant received a lumbar epidural steroid injection under fluoroscopic guidance at L4-5. The claimant had a repeat transforaminal epidural steroid injection at L5 by Dr. Quinones on 02/09/2009. Dr. Quinones performed a lumbar epidural steroid injection under fluoroscopic guidance at the right L2-4 medial branch and L5 dorsal ramus on 06/24/2009 and again on 07/17/2009. Dr. Schenker performed on 08/05/2009 a steroid injection for right facet syndrome under fluoroscopic guidance at C4.

A neuropsychological evaluation using the Minnesota Multiphasic Personality Inventory-2 RF (MMPI) dated 02/12/2009 showed that Mr. Van Deventer had a dysthymic disorder, which was exacerbated by ongoing pain and physical limitations from his back and Achilles tendon conditions. Additionally, the evaluation validated that his cognitive skills were intact and he had no clinically significant behavior impairment. In conclusion, the claimant's dysthymia and anxiety did not reach the level of functional impairment, which would prevent him from working full time in his position as a Senior Compliance Analyst.

MRI scans of 05/26/2009 exhibited a multilevel cervical spondylosis, most notable in the upper cervical spine at C4-5 with mild cord compression without intrinsic cord signal alteration.

A rehabilitation note from Heartland Rehabilitation Services dated 06/08/2009 documented the claimant received treatment consisting of hot packs/cold packs, ultrasound, manual therapy, therapeutic exercise and massage three times a week for three weeks.

Confidential
Admin Rec. 00595

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 3

On 07/15/2009, the claimant was treated at Community Medical Center Emergency Room for acute headache. A CT scan of the head with and without contrast was normal. He was treated with Fioricet orally and discharged home with written instruction.

A neurology consultation note dated 07/22/2009 contemplated a diagnosis of underlying right lumbosacral radiculopathy at L4-5; and cervicogenic headache due to facet syndrome of the cervical spine from C3 to C6 on the right. Dr. Schenker suggested a Medrol Dosepak.

A Functional Capacity Evaluation (FCE) by Biokinetics on 07/23/2009 demonstrated self-limited performance during all six components of this evaluation. The test was considered invalid. An accurate portrait of the claimant's ability to perform on postural tasks and maximum physical abilities was not determined because of his self-limited performance.

On 07/27/2009, the claimant received a neurological consultation and treatment for possible facet syndrome. He had another steroid injection under fluoroscopic guidance, this time to the C3 facet area.

An orthopedic Independent Medical Examination by Dr. Barr to review treatments received by Mr. Van Deventer to date on 07/29/2009 indicated that the claimant had degenerative disc disease of the cervical spine facet syndrome, degenerative disc disease of the lumbar spine with facet syndrome, depression and anxiety, and left Achilles tendinosis. Dr. Barr, the consulting orthopedic surgeon, concluded the following; Mr. Van Deventer was capable of sedentary duty for an eight-hour day with the provisos he could change position every 30 minutes, no bending or lifting, as well as frequent position changes. He further concluded that the treatment received up to the point of his consultation seemed appropriate and necessary. He suggested that the only additional treatment recommended would be a home exercise program and nonsteroidal anti-inflammatory medications.

Dr. Barr further concluded on 08/4/2009 that the FCE done on 07/23/2009 by Biokinetics indicating that the claimant was not capable of full duty was based on the claimant's self-limiting behavior.

A neurology consultation on 09/18/2009 indicated Mr. Van Deventer had responded extraordinary well to the cervical spine injection of 08/05/2009. He had no symptoms with regard to the cervical spine, although he continued to complain of pain in the lumbosacral region.

A rehabilitation evaluation report note dated 09/30/2009 documented the claimant was able to perform exercise with no change in pain. He was to continue with once-weekly therapy for three weeks. Additionally, the claimant received 16 sessions of daily chiropractic treatment from Pollack Health and Wellness from 10/21/2009 to 12/1/2009.

Dr. Schenker did a steroid injection to the left facet under fluoroscopic guidance to the L4-5 on 11/20/2009.

Functional Capacity Evaluation notes dated 01/07/2010 concluded that based on Mr. Van Deventer's performance, he met the essential postural and physical demands of any sedentary occupation without restriction for an eight-hour work day.

Confidential
Admin Rec. 00596

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 4

Dr. Barr performed another orthopedic consultation and review of all treatments received by Mr. Van Deventer to date on 01/27/2010. He diagnosed degenerative disc disease, cervical spine, with cervical facet syndrome; lumbar spine degenerative disc disease with facet syndrome; depression and anxiety; and left Achilles tendinosis - all unchanged diagnoses from his prior consultation on 07/29/2007. Dr. Barr reviewed the Functional Capacity Evaluation and he concluded that the result was invalid and its determination was inaccurate to make a definitive decision. Dr. Barr further concluded that the claimant was capable of sedentary duty work, and capable of an eight-hour work day. He further concluded that the treatment received up to the point of his consultation seemed appropriate and necessary. He suggested that the only additional treatment recommended would be home exercise program and non-steroidal anti-inflammatory drugs (NSAID).

A third Functional Capacity Evaluation was done on 06/23/2010 by Ellen Smith, OTR, CVE. She concluded that based upon Mr. Van Deventer's performance, he had less than sedentary capacities, and he could not resume his longstanding career as Senior Compliance Officer.

Dr. Renat Sukhov conducted an Independent Medical Evaluation of the records on 08/05/2010 for the purpose of disability determination. He concluded that the records did not provide compelling evidence which would restrict the claimant's ability to sustain at least sedentary capacity work with lifting and carrying 10 pounds occasionally and possibly 10 pounds routinely, walking for two hours in an eight-hour workday and sitting for six hours in an eight-hour workday with adequate breaks. Moreover, the medical records did not indicate the claimant's inability to ambulate functional distances on even and uneven surfaces, drive and negotiate stairs.

It was the opinion of the reviewer that the claimant's upper extremity activities were not restricted. The claimant had a range of motion above shoulder level appropriate to be able to do work-related activities. Dr. Sukhov concluded that MRI findings of the lumbosacral spine were not significant in the claimant's case due to the fact that many people without back pain have disk bulges or protrusions. Moreover, it was Dr. Sukhov's opinion that not all degenerative disc pathologies are painful and that at least 20% of asymptomatic controls under the age of 60 years have been found to have herniated discs.

OCCUPATIONAL HISTORY:
Mr. Van Deventer worked with the ski patrol for the United States Army. He worked as a Senior Compliance Officer at Johnson & Johnson. He was placed on short-term disability because of the exacerbated back injury and left Achilles tendon injury. He returned to work in March 2009, but then he went on long-term disability and received such benefits until 03/08/2010.

PAST MEDICAL HISTORY:
Past medical history revealed no other serious medical conditions. Review of medical records revealed claimants injured his back in 1979 and his right knee when he worked with ski patrol for the Army and history of motor vehicle accident in 2007 for which he had no treatment. In 2005, the claimant had arthroscopic surgery of the right knee.

CURRENT MEDICATIONS AND ALLERGIES:
He takes oral clonazepam, Effexor XR, Lexapro, Butalbital, Percocet, Skelaxin, Mobic for depression and oral ibuprofen for pain and inflammation.

Confidential
Admin Rec. 00597

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 5

ALLERGIES:
He has no known allergies.

SOCIAL HISTORY:
He denies tobacco use. He has one drink of alcohol per month.

DATA REVIEW:
Diagnoses:
1) Degeneration disc disease of thoracic or lumbar intervertebral discs;
2) Lumbosacral spondylosis without myelopathy;
3) Lumbar and thoracic sprains;
4) Tenosynovitis of foot and ankle;
5) Dysthymic disorder, anxiety and depression, depressive reaction, neurotic depressive state, and reactive depression;
6) Cervical intervertebral disc displacement without myelopathy; neuritis (brachial) or radiculitis due to displacement of cervical intervertebral disc;
7) Cervical spondylosis with myelopathy; anterior spinal artery compression syndrome; spondylogenic compression of cervical spinal cord; and vertebral artery compression syndrome;
8) S/P arthroscopic surgery of right knee in 2005.

Diagnostic Data:
*MRI and CT Scans*
1) On 11/13/2008; MRI scan of the lumbosacral spine revealed diffuse facet degenerative changes.
2) On 05/22/2009; MRI of cervical spine showed multi-level cervical spondylosis, most notable in the upper cervical spine at C4-5, with mild cord compression without intrinsic cord signal alteration.
3) On 07/15/2009; CT scan of the head with and without contrast was normal.

*Special Studies*
Minnesota Multiphasic Personality Inventory-2 RF (MMPI) dated 02/12/2009.

*Rehabilitation* (with dates of from and to)
1) 06/08/2009-hot /cold packs, ultrasound, manual therapy, therapeutic exercise and massage three times a week for three weeks;
2) 09/30/2009- hot /cold packs, ultrasound, manual therapy, therapeutic exercise and massage weekly for three weeks of therapy;
3) 12/01/2009- hot /cold packs, ultrasound, manual therapy, therapeutic exercise and massage once a week for four weeks of therapy;

*Procedures* (epidurals, trigger point and other blocks)
1) 01/26/2009- lumbar epidural steroid injection under fluoroscopically guidance at L4-5;
2) 02/09/2009- transforaminal epidural steroid injection L5;
3) 06/24/2009- lumbar epidural steroid injection under fluoroscopically guidance at right L2-4 medial branch and L5 dorsal ramus;
4) 07/17/2009- lumbar epidural steroid injection under fluoroscopically guidance at right L2-4 medial branch and L5 dorsal ramus;

Confidential
Admin Rec. 00598

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 6

    5)  07/27/2009- steroid injection to the C3 facet under fluoroscopic guidance;
    6)  08/05/2009- steroid injection for right facet syndrome under fluoroscopic guidance at C4;
    7)  11/20/2009- steroid injection to the left facet under fluoroscopic guidance to the L4-5 area.

CONCLUSION:
Based upon review of the medical records and all enclosed documentation, the following opinion is offered within a reasonable degree of medical certainty.

Records reviewed for this report include:

1.   08/05/2010 Dr. Renat Sukhov Physical Medicine and Rehabilitation IME Document review;
2.   07/28/2010 referral form;
3.   07/28/2010 absent report;
4.   07/01/2010, 04/23/2010, 03/11/2010, 03/08/2010, 02/23/2010, 02/18/2010, 12/17/2009-claim correspondence communications;
5.   06/03/2010, attorney correspondence;
6.   06/23/2010, Ellen Smith, OTR, CVE, CPE, Functional Capacity Evaluation (FCE)
7.   Undated modified/alternative duty form;
8.   05/09/2010 correspondence;
9.   01/27/2010, 01/11/2010 office visits note;
10.  01/27/2010 Dr. Barr orthopedic consultation note;
11.  01/07/2010 Biokinetics Whole Body Strength Evaluation and Functional Capacity Evaluation (FCE);
12.  12/01/2009 Dr. Strouse attending physician;
13.  11/23/2009 authorization form;
14.  10/21/2009 Pollack Health and Wellness Inc. chiropractic treatment note;
15.  09/30/2009 Heartland Rehabilitation Services therapy notes;
16.  09/18/2009 Dr. Schenker neurologist consultation;
17.  08/05/2009 Dr. Schenker steroid injection operation procedure;
18.  08/04/2009  Dr. Barr orthopedic consultation of the Functional Capacity Evaluation (FCE)  done on 07/23/ 09 by Biokinetics;
19.  07/29/2009 Dr. Barr, Orthopedic consultation and Independent Medical Examination review;
20.  07/23/2009 Biokinetics Functional Capacity Evaluation (FCE);
21.  07/22/2009 Dr. Schenker neurologist consultation note;
22.  07/17/2009 Dr. Carmen Quinones pain management treatment operation note;
23.  07/15/2009 Community Medical center emergency room record;
24.  06/24/2009 Dr. Carmen Quinones pain management treatment notes;
25.  06/08/2009 Heartland Rehabilitation therapy notes;
26.  05/26/2009 Advanced Medical Imaging MRI report;
27.  02/12/2009 Kenneth C. Kutner Ph. D. neuropsychological examination;
28.  01/26/2009 Dr. Carmen Quinones pain management notes;
29.  01/13/2009 Dr. Norman Heyman orthopedic consultation for IME;
30.  01/13/2009 Dr. Rajput psychiatrist consultation note;
31.  11/13/2008 Advanced Medical Imaging MRI report.

Confidential
Admin Rec. 00599

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 7

Mr. Van Deventer is claiming to be unable to perform sedentary activities due to a variety of medical diagnoses which are noted on Page 5 under "Data Review and Diagnoses".

He had a neuropsychological and psychological evaluation by Dr. Kenneth Kutner on 02/12/2009. He diagnosed dysthymic disorder. He also noted that Mr. Van Deventer did not demonstrate emotional lack of control; additionally the patient exhibited appropriate affect throughout the examination without loss of composure. He did not have any evidence of neural cognitive impairment in terms of attention, concentration, reasoning, intellect, speech, information processing, language, memory or spatial functioning. He did not demonstrate any testing impairments and there was no evidence or formal thought disorder or psychotic behavior abnormalities. He had no clinically significant behavior abnormalities. He was deemed to be psychologically capable of performing an eight-hour per day job. He did have dysthymic disorder with some anxiety, but it did not reach the level that it would prevent him from doing his usual job and his usual activities without limitation.

He was also treated for tenosynovitis of the foot and ankle. He apparently had intermittent swelling of the left Achilles tendon, but the problem did not rise to the point that he needed a MRI scan of that area, nor did he need any surgical intervention. Review of the records indicates that at most he has had intermittent discomfort and swelling in his ankle. That would preclude him from spending a great deal of time on his foot in terms of walking. As such, he was limited to standing no more than 30 minutes at one time on his feet without a corresponding equal period of rest. This was well beyond what is necessary for a sedentary position. There is no objective evidence outside of intermittent swelling of any other abnormality with that tendon. He has had no other diagnostic studies that show any further complications.

In regards to his neck, he has only had one objective diagnostic study done. A MRI scan of the neck done on 05/22/2009 showed multilevel cervical spondylosis noted in the upper spinal regions of C4 through C6. There was minimal cord compression without any intrinsic cord signal alteration. These were mild diffuse changes that were degenerative in nature without any disc herniation, protrusion or cord compression. There was no foraminal outlet obstruction, neural foramina stenosis or central canal stenosis.

In the lumbar spine he also only had one diagnostic study done and that was a MRI scan of 11/13/2008. It showed some degenerative desiccation changes at L3-L4 as well as L4-L5. There was right lateral disc herniation at L4-L5 with some degenerative changes noted. There was mild central canal stenosis and mild neural foraminal encroachment on the right side at L4-L5. At L5-S1 there was a sacralization of L5 without any other abnormalities. These were deemed to be mild facet degenerative changes.

The patient never has had an EMG/NCV study, CAT scan, myelogram or other diagnostic studies beyond these two.

His examination by several providers has not shown him to have any neurological abnormalities. Dr. Schenker, his treating neurologist, indicated he had pain and discomfort, but there was no objective evidence of any neurological abnormalities. Similarly, when he seen on 07/15/2009 in the emergency room at Community Medical Center by Dr. Aroomi, there were no objective neurological abnormalities. Dr. Barr examined him on 01/27/2010 and also found no objective neurological abnormalities.

Confidential
Admin Rec. 00600

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 8

He has not had on any of the people that have examined him find any loss of reflexes, atrophy, dermatomal loss of sensation, long tract signs, positive Babinski's, positive Hoffmann's, or any other objective neurological abnormalities.

Dr. Barr saw him on two occasions, 07/29/2009 and 01/27/2010. He exhibited, except for some mild decreased range of motion, no abnormalities and no objective neurological findings.

Dr. Heyman, in his examination on 01/14/2009, could not find any deficits, long tract signs, aberrant reflexes or anything else abnormal. He had some mild decreased range of motion and he had thickening of the Achilles tendon, but nothing else was noted.

A prior record review done by Dr. Sukhov on 09/30/2009, similarly found no objective evidence of abnormalities.

Furthermore, the patient has had Functional Capacity Evaluations (FCE) performed. On the FCE of 07/23/2009 by Biokinetics, he demonstrated several positive Waddell signs for nonorganic source of pain. In the scale used by Biokinetics any more than three positive findings casts aspersions on the validity of the test, the effort provided by the examinee, and the overall results. He demonstrated at least four abnormalities in that regard. In evaluation and conclusion, the examiner noted that the patient demonstrated inconsistent effort throughout all six components of the evaluation. There were four positive nonorganic pain signs, a high positive coefficient of variation of eight of 11 strength tests with two positive horizontal displacement values indicating significant less than full effort performance during testing and various aspects of gait imbalance. The performance was not an accurate portrayal with maximum physical abilities, and the test was not deemed to be valid.

He underwent a second Functional Capacity Evaluation on 01/07/2010 also by Biokinetics. This time he gave a much more consistent effort, and he was deemed to have met the essential postural and physical demands of for sedentary work without restrictions for an eight-hour workday.

A third Functional Capacity Evaluation was done on 06/23/2010. Mr. Van Deventer at the beginning of the test indicated he was not feeling well with pain 7/10 in the low back and 8/10 in the left Achilles tendon. The therapist in this Functional Capacity Evaluation determined that he was not able to sit and work at a sedentary job; she did record that his job involved use his hands to do all of the necessary computer work, paperwork and other administrative work.. She took a history and obtained medical information. She noted his complaints regarding pain, physical tolerances and limitations of the activities of daily living.

She noted that his mobility was good in the sitting position and that he was able to perform well. She also noted that he had good hand grip strength and there was no impairment to his working in the sitting position because of his upper extremity movement and hand grip. His manipulation and typing also appeared to be normal. She stated, however, that because of his inability to bear weight on his left heel his sitting posture was abnormal, which made it difficult for him to work on his computer. It is uncertain how she arrived at that conclusion. She noted he was able to sit for 45 minutes at a time, but then needed a break. She also noted he was able to lift a 10-pound box and could handle weights of that category and caliber.

Confidential
Admin Rec. 00601

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 9

Under the Discussion and Assessment, the therapist concluded that he gave a viable effort. There, however, are no consistency measurements in this Functional Capacity Evaluation. There is no evidence she did any tests to ascertain that Mr. Van Deventer had given a valid effort. There are no coefficients of variation measurements, tests or comparisons within the test itself. She came to the conclusion that basically because of his inability to ambulate and use his left heel that it affected his sitting posture and his ambulatory posture and made it difficult to perform in a sedentary position. It is uncertain the rationale behind this.

It is my opinion based upon a reasonable degree of medical certainty that Mr. Van Deventer is capable of sedentary work. He had two Functional Capacity Evaluations. The first one was invalid due to poor effort, the second one showed he could work in a sedentary capacity, and the third one said he could not, but was not validated with any objective measurements or testing for consistency and maximum effort. The proffered rationale of why he could not work was not convincing.

Repetitive examinations by his own treating physicians and outside examiners never found him to have any objective evidence or neurological abnormalities. He does have some mild decreased range of motion and he does have some intermittent swelling of his left heel, which does limit him in terms of his ability to walk. However, he is able to perform in a sedentary occupation without any problem based upon all of his evaluations.

His objective tests including the MRI scans of the cervical and lumbar spines do not show him to have any significant lesion that would preclude him from doing sedentary activity. He has mild degenerative changes including some facet hypertrophy, disc herniation in one area, but there is no compressive lesion, nerve root edema, nerve root compression, nerve root impingement, foramina stenosis or central canal stenosis. These mild degenerative changes would not preclude him from working in a sedentary position.

There are several diagnoses listed on his form as to why he cannot work. As stated above, the degenerative disc disease of the thoracic, lumbar and vertebral discs is not significant nor would it preclude him from working. Lumbosacral spondylosis is another way of saying the same thing as are arthritic changes. Lumbar and thoracic sprains are very similar diagnoses.

Tenosynovitis of the foot and ankle does limit him in his ability to have prolonged standing and walking and that is taken into account, but it does not limit him in his ability to do sedentary work.

Although he has a dysthymic disorder, anxiety and depression, he is able to work and should work without any restrictions. He has undergone extensive neuropsychological and psychological evaluations which deem him to be able to do so without any apparent cognitive disorder.

Although cervical and vertebral disc without myelopathy, neuritis and radiculitis is listed, there is absolutely no evidence he has any of these condition. His neurological examination has been normal. He has no EMG/NCV study or other objective evidence of electrophysiological abnormalities. His reflex, sensation and motor findings are normal. In short, there is absolutely no evidence that he has neuritis of any sort.

Confidential
Admin Rec. 00602

RE: Ralph Van Deventer, Jr.
11/03/2010
Page 10

It has been listed that he has spinal artery compression of the anterior spinal artery and vertebral artery compression. However, there is absolutely no diagnostic study or evidence to show that this is true. He has not had any MRA scans or any vertebral vascular studies to show that he has anterior artery spinal artery or vertebral artery compression. He has no signs or symptoms that are associated with such a diagnosis. Although these are listed as diagnoses, there is absolutely no evidence, diagnostic studies or even symptoms that would be commiserate with that type of diagnosis. Clearly, this would not be impairment for him without any objective evidence.

In short, based upon all of the above information it is my opinion that this individual has been capable of sedentary duty for some time well before the 03/10/2010 date when his benefits were terminated.

Respectfully submitted,

Kevin Trangle, M.D., M.B.A.
Fellow, American College of Occupational and Environmental Medicine (FACOEM)
Fellow, American Academy of Disability Evaluating Physicians (FAADEP)
Board Certified Internal Medicine (BCIM)
Certified, American Board of Independent Medical Examination (ABIME)
Certified Independent Medical Examiner (CIME)
Certified Medical Review Officer (CMRO)

KLT:ch

Confidential
Admin Rec. 00603

# Second Level LTD Appeal Clinical Review Recommendation
# Date: 11/22/10

RE: Ralph Van Deventer, Jr.

WWID- 10900
1st day out: 9/8/08
LTD date: 3/8/09
Any occ transition: 3/8/10
Denied: 3/10/10

1st level upheld due to: IME and FCE found EE capable of sedentary work position

Outcome of 2nd level review:

1/7/10 (Biokinetics) FCE-deemed to have met the essential postural and physical demands of sedentary work for an 8 hr day.

6/23/10 (Smith, OTR,CVE) FCE-less than sedentary work capacity would be distracted by pain.

8/5/10 (Sukov, MD) IME- can perform sedentary work capacity with restrictions. Medical records did not indicate that EE could not ambulate functional distances on even and uneven surfaces, drive or negotiate stairs which contradicts what FCE report mentioned. EE's upper extremity activities were also not restricted.  EE had good ROM above the shoulder level making it appropriate for him to do these activities.

11/3/10 (Trangle, MD) paper file review
Above individual has been capable of sedentary work for some time well before the 3/10/10 date when his benefits were terminated.

## Recommendation:
Uphold denial, medical evidence reviewed and there was no clinical evidence supporting this EE's inability to perform work at a sedentary level with restrictions or limitations that would deem him ineligible to receive benefits under the any occupation definition under the Plan.

Confidential
Admin Rec. 00604

*Johnson & Johnson*

November 22, 2010

**VIA CERTIFIED MAIL**

Stephen Roger Bosin
70 Grand Avenue
River Edge, NJ 07661

Re:     **Final Appeal Determination Update**: Claim for Benefits under the Long Term
        Disability (LTD) Income Plan for Choices Eligible Employees of Johnson & Johnson and
        Affiliated Companies (the "Plan") – **Ralph R. Van Deventer, Jr.**

Dear Mr. Bosin:

We are in receipt of your letter dated August 24, 2010, which was received on August 27, 2010,
and in which you made a final appeal for continued LTD benefits under the Plan, on behalf of
your client, Ralph R. Van Deventer, Jr.  We have reviewed Mr. Van Deventer's appeal, and the
documentation that you submitted in support of his appeal, together with Mr. Van Deventer's
entire claim file.  Based on this review, we regret to inform you that the denial of Mr. Van
Deventer's claim has been upheld.  This determination is final and binding.

**Specific Reasons for Determination and Reference to Plan Provisions**

Factual Background and Claim History – The Administrative Record ("Admin. Rec.") of Mr.
Van Deventer's claim indicates that he began employment with a Johnson & Johnson company
on April 24, 1989, most recently as a Senior Compliance Analyst.  (Admin. Rec. 0008.)  Mr. Van
Deventer's first day of absence on account of disability, and the date that his short term disability
("STD") benefits began, was September 8, 2008.  (Admin. Rec. 0008.)  The condition for which
Mr. Van Deventer claims disability benefits is degeneration of cervical, thoracic and lumbar
intervertebral disc.  (Admin. Rec. 0009.)  STD benefits were paid through March 7, 2009.
(Admin. Rec. 0002.)  Mr. Van Deventer's claim for continued LTD benefits was denied effective
March 10, 2010.  (Admin. Rec. 0002.)  It appears that Mr. Van Deventer receives Social Security
disability income benefits ("SSDI"), because the SSDI award letter dated May 9, 2010 is in his
claim file.  (Admin. Rec. 0171-0174.)

As noted, Mr. Van Deventer's claim for LTD Plan benefits was initially denied effective March
10, 2010 by letter dated February 18, 2010.  (Admin. Rec. 0190-0191.)  In that letter, the Service
Administrator, Reed Group ("Reed"), informed Mr. Van Deventer that a Functional Capacity
Evaluation ("FCE") and an Independent Medical Examination ("IME") conducted in January
2010 had both concluded that he was capable of sedentary work, and explained the process for
appeal.  In a letter dated June 28, 2010 you appealed the initial determination on Mr. Van
Deventer's behalf.  (Admin. Rec. 0150-0154.)  You critiqued the January 2010 FCE and IME,
and attached certain documentation in support of Mr. Van Deventer's appeal.  His appeal was
acknowledged in a letter from Reed dated July 1, 2010.  (Admin. Rec. 0149.)

Confidential
Admin. Rec. 00605

Stephen Roger Bosin
November 22, 2010
Page 2

In a letter dated August 10, 2010, Reed informed you that the initial denial of Mr. Van Deventer's benefits, as of March 10, 2010, had been upheld based upon a clinical review of his file. The letter also explained Mr. Van Deventer's appeal rights. (Admin. Rec. 0127-0130.)

In a letter dated August 24, 2010, and received August 27, 2010, you made a final appeal on Mr. Van Deventer's behalf of the denial of LTD benefits. (Admin. Rec. 0114-0115.)   Mr. Van Deventer's final appeal was acknowledged by letter dated August 31, 2010 from Reed. (Admin. Rec. 0113.)

By letter dated October 4, 2010, the Plan Administrator informed you that a 35-day extension was required in order to complete a full and fair review of Mr. Van Deventer's claim. (Admin. Rec. 0593.)

No additional medical documentation was submitted by you, Mr. Van Deventer or Mr. Van Deventer's treating physicians on final appeal.   This letter is the final determination on his appeal.

Plan Provisions Considered With Respect to Your Claim - The terms of the Plan are described in the documents entitled "Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson and Affiliated Companies" ("LTD Plan"), "Choices Disability Plan Details" ("Disability Plan Details") and "General/Administrative Information Plan Details" ("G/A Plan Details").

The LTD Plan provides, in pertinent part:

> For periods of disability beginning on or after July 1, 2004, the term "Total Disability" or "Totally Disabled" means:
>
> * * *
>
> (b) during the portion of any period of disability not exceeding 12 months following the duration of the Elimination Period, the complete inability of the Participant, due to Sickness or Injury, to perform the Essential Functions of his or your Regular Occupation, with or without reasonable accommodation; AND
>
> (c) during the remainder, if any, of the period of disability, the complete inability of the Participant, due to Sickness or Injury, to perform **any job** for which the Participant is (or may reasonably become) with or without reasonable accommodation qualified by training, education or experience. (LTD Plan, p. 6.) (Emphasis in the original.)

The Plan further provides that no benefits under the Plan shall be payable:

Confidential
Admin. Rec. 00606

Stephen Roger Bosin
November 22, 2010
Page 3

> •   on or after the date a Participant fails or refuses to provide medical
> certification or other proof within 15 days of receipt of a written request
> from the Plan Administrator or Claims Service Organization for proof that
> he\she continues to be Totally Disabled, or otherwise fails or refuses to
> cooperate with respect to the evaluation of his\your Total Disability or
> continuing Total Disability or suitability for rehabilitation employment or
> with respect to any procedure, evaluation, investigation or audit in
> connection with this Plan or any other benefit plan maintained by an
> Employer in which the Participant is or was entitled to participate while
> receiving LTD benefits, whether performed by the Plan Administrator, the
> Claims Service Organization or any other delegate of the Plan
> Administrator; (LTD Plan, pp. 14-15.)

Under the Plan, when a claim is denied, the Participant or a duly authorized representative, may
file a written appeal within one hundred and eighty (180) days to the Claims Service
Organization, which will have forty-five (45) days to render a decision on the appeal.    An
additional forty-five (45) day extension may be taken, but in no event will the decision on appeal
be rendered more than ninety (90) days after receipt of the appeal request.    If the appeal is
denied, the Participant or a duly authorized representative may, within sixty (60) days after
receipt of the appeal denial, make a written appeal to the Pension Committee, which will have
forty-five (45) days to render a decision on the final appeal.  An additional forty-five (45) day
extension may be taken, but in no event will the final decision on appeal be rendered more than
ninety (90) days after receipt of the final appeal request.  (LTD Plan, pp. 10-11; and Disability
Plan Details, pp. 18-19.)

In addition, the Plan provides:  "It is the Participant's responsibility to provide the Claims
Service Organization with all information necessary to evaluate his or her medical condition and
functional capacity, including but not limited to the information supplied by the treating
Provider." (LTD Plan, p. 13.)

The Claims Service Organization for the Plan is Reed Group.  (G/A Plan Details, p. 50.)

The Plan Administrator for the Plan is the Pension Committee of Johnson & Johnson. (G/A Plan
Details, p. 45.)  The G/A Plan Details state:

> In making determinations under a Plan, the Plan Administrator has the authority
> and discretion to interpret the Plan and resolve factual disputes.  This authority
> and discretion may be exercised by Service Administrators . . . and others to
> whom the Plan Administrator delegates administrative authority regarding claims
> or appeals under a Plan.  (G/A Plan Details, p. 45.)

In the exercise of our discretion under the Plan, we review the entire file on appeal.    We
consistently enforce all timing requirements, and consistently require objective evidence in
support of claims for benefits under the Plan.

Confidential
Admin Rec. 00607

Stephen Roger Bosin
November 22, 2010
Page 4

Reasons for Denial and Application of the Plan – Throughout the period that Mr. Van Deventer
received disability benefits he was periodically asked to cooperate with an evaluation of his
disability status, which he did.

As part of a review of Mr. Van Deventer's disability status with respect to the transition of the
application of the "own occupation" standard of disability to the "any job" standard of disability,
Reed arranged for him to undergo a FCE on January 7, 2010. In his report of January 11, 2010
(Admin. Rec. 0198-0217), Charles Filippone, PT, concluded that Mr. Van Deventer was capable
of working full-time at a sedentary duty capacity without restrictions.

Subsequently, Reed arranged for Mr. Van Deventer to undergo an IME with Lawrence I. Barr,
D.O., an orthopedic spine surgeon, who conducted a physical examination of Mr. Van Deventer
and reviewed his medical records. In a report dated January 27, 2010 (Admin. Rec. 0193-0197),
Dr. Barr referred to the IME report that he issued on July 29, 2009 (Admin. Rec. 0337-0343).
Dr. Barr disagreed with the results of the January 2010 FCE, and stated that Mr. Van Deventer
was now capable of performing a sitting job for 8 hours per day, with the limitation of having the
ability to change position as needed.

During the appeal process, you submitted an FCE report dated June 23, 2010 from Ellen Rader
Smith, OTR. (Admin. Rec. 0156-0169.) Ms. Smith reported the results of the FCE conducted
on May 5, 2010, and concluded that Mr. Van Deventer's functional capacity was less than
sedentary, because she opined that he could not perform any sedentary job requiring sustained
sitting, and he would be distracted by pain.

All of the documentation submitted on Mr. Van Deventer's behalf was clinically reviewed on
August 5, 2010, by Renat Sukhov, M.D., who specializes in physical medicine/rehabilitation.
(Admin. Rec. 0137-0148.) Dr. Sukhov, after reviewing Mr. Van Deventer's entire claim file,
opined that he was capable of sedentary duty work, as long as he could change positions every
30 to 45 minutes and with no lifting.

In your final appeal dated letter August 24, 2010, you critiqued the opinion of Dr. Sukhov,
stating, among other things, that Ms. Smith's FCE report had been misread, and that the SSA
decision awarding SSDI benefits had not found that the ability to change positions determinative
of its decision. (Admin. Rec. 0114-0115.) In addition, you stated that because Mr. Van
Deventer's attempt to return to work, with the ability to change positions every 20 minutes,
failed, Dr. Sukhov's conclusion regarding that ability was invalid. However, we do not find the
earlier attempt to return to work relevant to Dr. Sukhov's conclusion. We note that Mr. Van
Deventer's attempt to return to work was not contemporaneous with the January 2010 FCE and
IME, or Dr. Sukhov's August 2010 claim file assessment, and was during a period for which Mr.
Van Deventer received disability benefits.

Upon receipt of Mr. Van Deventer's final appeal, we arranged for his entire claim file to be
assessed by Kevin Trangle, M.D. Dr. Trangle specializes in Internal Medicine, is also a Fellow,
American College of Occupational and Environmental Medicine, a Fellow, American Academy

Stephen Roger Bosin
November 22, 2010
Page 5

of Disability Evaluating Physicians, and is certified by the American Board of Independent
Medical Examination. In a report dated November 3, 2010, Dr. Trangle concluded:

> It is my opinion based upon a reasonable degree of medical certainty that Mr. Van
> Deventer is capable of sedentary work. He had two Functional Capacity
> Evaluations. The first one was invalid due to poor effort, the second one showed
> he could work in a sedentary capacity, and the third one said he could not, but was
> not validated with any objective measurements or testing for consistency and
> maximum effort. The proffered rationale of why he could not work was not
> convincing.
>
> Repetitive examinations by his own treating physicians and outside examiners
> never found him to have any objective evidence or neurological abnormalities. He
> does have some mild decreased range of motion and he does have some
> intermittent swelling of his left heel, which does limit him in terms of his ability
> to walk. However, he is able to perform in a sedentary occupation without any
> problem based upon all of his evaluations.
>
> His objective tests including the MRI scans of the cervical and lumbar spines do
> not show him to have any significant lesion that would preclude him from doing
> sedentary activity. He has mild degenerative changes including some facet
> hypertrophy, disc herniation in one area, but there is no compressive lesion, nerve
> root edema, nerve root compression, nerve root impingement, foramina stenosis
> or central canal stenosis. These mild degenerative changes would not preclude
> him from working in a sedentary position.
>
> There are several diagnoses listed on his form as to why he cannot work. As
> stated above, the degenerative disc disease of the thoracic, lumbar and vertebral
> discs is not significant nor would it preclude him from working. Lumbosacral
> spondylosis is another way of saying the same thing as are arthritic changes.
> Lumbar and thoracic sprains are very similar diagnoses.
>
> Tenosynovitis of the foot and ankle does limit him in his ability to have prolonged
> standing and walking and that is taken into account, but it does not limit him in
> his ability to do sedentary work.
>
> Although he has a dysthymic disorder, anxiety and depression, he is able to work
> and should work without any restrictions. He has undergone extensive
> neuropsychological and psychological evaluations which deem him to be able to
> do so without any apparent cognitive disorder.
>
> Although cervical and vertebral disc without myelopathy, neuritis and radiculitis
> is listed, there is absolutely no evidence he has any of these condition. His
> neurological examination has been normal. He has no EMG/NCV study or other
> objective evidence of electrophysiological abnormalities. His reflex, sensation and

Confidential
Admin Rec. 00609

Stephen Roger Bosin
November 22, 2010
Page 6

> motor findings are normal. In short, there is absolutely no evidence that he has
> neuritis of any sort.
>
> It has been listed that he has spinal artery compression of the anterior spinal artery
> and vertebral artery compression. However, there is absolutely no diagnostic
> study or evidence to show that this is true. He has not had any MRA scans or any
> vertebral vascular studies to show that he has anterior artery spinal artery or
> vertebral artery compression. He has no signs or symptoms that are associated
> with such a diagnosis. Although these are listed as diagnoses, there is absolutely
> no evidence, diagnostic studies or even symptoms that would be commiserate
> with that type of diagnosis. Clearly, this would not be impairment for him without
> any objective evidence.
>
> In short, based upon all of the above information it is my opinion that this
> individual has been capable of sedentary duty for some time well before the
> 03/10/2010 date when his benefits were terminated. (Admin. Rec. 0594-0603.)

Therefore, Dr. Trangle came to the same conclusion as Dr. Barr, who examined Mr. Van
Deventer, and Dr. Sukhov, who also reviewed Mr. Van Deventer's file; that is, that he is no
longer disabled under the terms of the Plan.

With respect to Mr. Van Deventer's receipt of SSDI benefits, the Record reveals that he was
notified of the SSA's decision to award him disability benefits in May 2010. (Admin. Rec.
0108.) There is no indication that the SSA's determination was made or based upon the same
medical evidence utilized by the Plan Administrator in this determination. The FCE and IME
reports and claim file assessments, described above, upon which this determination was, in part,
based, could not have been considered by the SSA. Finally, as you may be aware, the definition
of disability, and the requirements for continued eligibility, under the SSA's program and under
the Plan are not the same, and therefore the ultimate results with respect to Mr. Van Deventer's
claim, are not necessarily the same. For example, the SSA program requires that age be taken
into consideration while the Plan does not require that age be considered. Accordingly, even if
the SSA decision was contemporaneous and considered the same medical evidence, the
difference in definitions and requirements can yield different results.

**Summary of Rationale for Denial**

We have evaluated all of the documentation related to Mr. Van Deventer's claim. This record
includes letters, office visit notes, and other medical records from Mr. Van Deventer's treating
physicians, including Drs. Strouse and Schenker; a FCE report from Mr. Filippone in January
2010, a FCE report from Ms. Smith from June 2010, an IME report by Dr. Barr in January 2010;
as well as independent file reviews by Dr. Sukhov in August 2010 and Dr. Trangle in November
2010. The documentation contains substantial objective evidence to support Reed's initial
determination that Mr. Van Deventer was capable of work at a sedentary level, with certain
restrictions and limitations, and was no longer disabled under the terms of the Plan, as of March
10, 2010.

Confidential
Admin Rec. 00610

Stephen Roger Bosin
November 22, 2010
Page 7

We therefore uphold the initial denial of Mr. Van Deventer's claim by Reed Group.

**Additional Information**

Pursuant to the Plan and to ERISA, this final review has been a "fresh" look, without deference to any prior denial decision. In addition, the final review was conducted by a person not involved in the prior denial decision, and who is not a subordinate of the prior decision maker.

Mr. Van Deventer is entitled to receive, upon written request and free of charge, any documents, records and other information that he has not yet received and that were relied upon in making this benefit determination, or that were submitted, considered or generated in the course of making this benefit determination, or that demonstrate compliance with the Plan's claims processing administrative procedure. To request this information, please contact: The Pension Committee of Johnson & Johnson, 1 Johnson & Johnson Plaza, New Brunswick, NJ 08933.

This is the last and final review of Mr. Van Deventer's claim that his benefits were improperly denied. Mr. Van Deventer has the right to pursue a civil action under Section 502 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1132. Under the terms of the Plan a lawsuit must be brought within twelve (12) months of the date of this letter. The review of this claim applied the Plan terms, and facts in the administrative record of this claim. Other than the documents referred to in this letter, no other internal rule, guideline, protocol or other similar criterion was relied upon in making this determination.

Very truly yours

Richard McDonald, Director
Corporate Benefits
For the Johnson & Johnson Pension Committee

cc: Natalie Madrid, Reed Group