NOT FOR PUBLICATION                                                                                                  CLOSED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RALPH R. VAN DEVENTER, JR., | Civil Action No.: 10-6344 (PGS) |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER |
| JOHNSON & JOHNSON PENSION COMMITTEE OF JOHNSON & JOHNSON, | |
| Defendant. | |

**SHERIDAN, U.S.D.J.**

This matter is before the Court on two motions: (1) Plaintiff Ralph Van Deventer, Jr.'s ("Plaintiff") motion for summary judgment and (2) Defendant Pension Committee of Johnson & Johnson's ("Defendant") cross-motion for summary judgment.

On or about December 7, 2010, Plaintiff filed a complaint against Defendant alleging that Defendant wrongfully terminated benefits owed to him from the Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson and Affiliated Companies (the "Plan").

For the reasons set forth below, this Court denies Plaintiffs' motion and Defendant's cross-motion, and remands the matter to the Plan Administrator.

I

Plaintiff began work at Johnson & Johnson ("J&J") in 1989. His last position at J&J was Senior Compliance Analyst, which the Plaintiff describes as a "desk job."

1

Plaintiff is a Plan participant. The Plan's LTD benefits are regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant is the Plan administrator, responsible for ensuring ERISA compliance. The Reed Group ("Reed") acts as an agent of Defendant, investigating claims, making initial benefit decisions, and deciding first-level appeals. J&J's Director of Corporate Benefits, Richard McDonald, decides second-level appeals on behalf of the Defendant. The Plan is funded by the Plan participants' premiums. (Defendant's Facts, ¶ 1).

Plan participants seeking LTD benefits must make themselves available for medical examinations arranged by Reed. All claimants must also apply for Social Security Disability Insurance ("SSDI") benefits. A claimant is eligible for LTD benefits if they prove they are "totally disabled."

The Plan provides two different, time-sensitive definitions of totally disabled.

> "Total Disability" or "Totally disabled" means:
> 
> . . .
> 
> (b) during the portion of any period of disability not exceeding 12 months following the duration of the Elimination Period, the complete inability of the Participant, due to Sickness or Injury to perform the Essential Functions of his or her Regular Occupation, with or without reasonable accommodation; AND
> 
> (c) during the remainder, if any, of the period of disability, the complete inability of the Participant, due to Sickness or Injury, to perform *any job* for which the Participant is (or may reasonably become) with or without reasonable accommodation qualified training education or experience.

Defendant's Facts, ¶ 5 (emphasis in original).

The Plan's documents grant Defendant the power to "construe and interpret the provisions of the Plan." Pursuant to this power, Defendant has interpreted the Plan as requiring objective evidence of total disability.

On September 8, 2008, Plaintiff stopped working due to "multiple weaknesses in his skeletal structure." On September 29, 2008, Plaintiff's attending physician Dr. Irving diagnosed him with tenosynovitis of the left ankle and a lumbar sprain. On November 13, 2008, a magnetic resonance image ("MRI") of Plaintiff's "lumbar spine" was taken and sent to Reed. The MRI revealed disc bulges, superimposed disc herniation, degenerative changes, and stenosis. In accord with Dr. Strouse's recommendations, Plaintiff refrained from work through January 28, 2009.

On January 28, 2009, Plaintiff applied to the Plan for LTD benefits. He asserted that he was unable to work because of chronic back pain and left Achilles tenosynovitis pain. Plaintiff received LTD benefits during his one-month stint of part-time work in March and April 2009. Initially, LTD benefits were terminated when Plaintiff returned to work full-time, but Reed reinstated Plaintiff's LTD benefits retroactively on September 4, 2009. Plaintiff eventually received LTD benefits for the month March 2009 through March 2010. As a prerequisite for providing these twelve months of LTD benefits, Reed must have found that Plaintiff was unable to perform his *regular occupation*.

Dr. Strouse alerted Reed that Plaintiff could resume work for up to four hours a day as of February 1, 2009. Dr. Strouse's February 5, 2009 Attending Physician Statement stated that Plaintiff was under treatment for his back and ankle conditions and should return to work part-time, but specifically indicated that Plaintiff was not totally disabled. After J&J arranged for a suitable part-time position, Dr. Strouse formally authorized Plaintiff to perform four hours of sedentary work a day from March 2, 2009 to April 6, 2009. Plaintiff returned to work on those terms. On March 23,

2009, a Reed nurse stated that Plaintiff reported pain and might be unable to return to full-time work. However, Defendant began working full-time after April 6, 2009.

An MRI of Plaintiff's cervical spine was completed on May 22, 2009. This MRI identified cervical spondyloisthesis, mild cord compression, stenosis, and disc bulges. On May 29, 2009, Plaintiff reported to Reed staff that he had disc bulges in his neck and was experiencing intense physical pain and headaches. On June 11, 2009 Dr. Strouse wrote to Reed indicating that Plaintiff was "a candidate for long term disability." On July 2, 2009, Plaintiff reported to Reed staff that he was experiencing pain in his lower back and achilles as well as headaches and stated that his pain medications (including Percocet and muscle relaxers) were ineffective. On July 17, 2009, Dr. Strouse wrote an Excuse Slip stating that Plaintiff should remain out of work until future notice. On July 21, 2009, Plaintiff stopped work. Apparently, Plaintiff has not worked since.

On July 27, 2009, Plaintiff received a facet injection to treat his back pain. Dr. Strouse completed an Attending Physician Statement form on December 3, 2009 in which he indicated that Plaintiff was totally disabled from any job due to osteoarthritis and degenerative disc disease. No details regarding the diagnosis were provided.

Charles Filippone is a physical therapist who was retained by Reed to evaluate Plaintiff. Mr. Filippone completed his first functional capacity evaluation ("FCE") of Plaintiff on July 23, 2009. In his report, Mr. Filippone stated that "[Plaintiff] does not meet the essential postural and physical demands of his occupation at this time." However, Mr. Filippone also reported that "accurate assessment of [Plaintiff's] physical strength abilities cannot be determined" because of "[Plaintiff's] significantly self-limited performance."

Dr. Lawrence I. Barr is an orthopedic surgeon who was retained by Reed to evaluate Plaintiff.

On July 29, 2009, Dr. Barr performed an independent medical evaluation of Plaintiff and diagnosed degenerative disc disease, cervical spine facet syndrome, lumbar spine facet syndrome, depression, anxiety, and left Achilles tendinosis. Dr. Barr concluded that Plaintiff "should be able to work an eight-hour day, but limited to sedentary duty with no bending or lifting. . . ." Dr. Barr further stated that Plaintiff "must be able to change his position every 30 minutes."

On August 4, 2009, Dr. Barr reviewed Mr. Filippone's first FCE of Plaintiff (dated July 23, 2009) and wrote to Reed regarding his reactions. Dr. Barr noted that the July 23, 2009 FCE results were undermined by Plaintiff's "self-limited performance" and "inconsistent effort." Dr. Barr concluded the letter with the statement "[m]y opinion *stands* at this point, based upon [Plaintiff's] complaints and self-limiting behavior, that [Plaintiff] is *not* capable of his full duty position." (*Id.*) (emphasis added). The contradiction between Dr. Barr's statement that Plaintiff was disabled and his insistence that this opinion was consistent with his earlier medical examination has been an ongoing source of dispute between the parties.

Mr. Filippone evaluated Plaintiff again on January 7, 2010. The FCE tested Plaintiff's strength, range of motion, gait, and balance. There is no indication whether Plaintiff's ability to remain seated was directly tested. In his report, Mr. Filippone stated that Plaintiff "meets the essential postural and physical demands of any sedentary occupation without restriction for an eight hour work day." Whereas Mr. Filippone questioned the results of the earlier FCE due to Plaintiff's allegedly "self-limited" effort, he indicated in the January 7, 2010 report that "[Plaintiff's] overall performance [was] an accurate portrayal of his maximum physical abilities."

On November 9, 2009, Reed notified Plaintiff that, due to the Plan's multi-tiered definition of total disability, his LTD benefits would be extended beyond twelve months only if Plaintiff

proved he was unable to perform *any job*. (Defendant's Facts, ¶ 55). Later, Reed notified Plaintiff that he had failed to establish that he was unable to perform any job and that his LTD benefits were being terminated as of March 9, 2010. (Defendant's Facts, ¶ 60). The denial letter asserted that the January 7, 2010 FCE and January 27, 2010 IME indicated that Plaintiff was capable of a sedentary job.

On January 27, 2010, Dr. Barr conducted a second medical examination of Plaintiff. The corresponding report mentions both of Mr. Filippone's FCEs. Dr. Barr noted that Mr. Filippone's second FCE (dated January 7, 2010) supported the conclusion that Plaintiff could work eight hours. Later in the report, Dr. Barr wrote, "[a]fter reviewing the Functional Capacity Evaluation, it is obvious that this was an invalid study. Any recommendations from the study would be inaccurate to say the least." Dr. Barr did not explain whether this statement referred to the July 23, 2009 FCE or the January 7, 2010 FCE. Dr. Barr's letter referred to Plaintiff's condition as "unchanged", able to "work an eight-hour day, but he must be able to change his position frequently." (*Id.*).

On June 23, 2010, Plaintiff hired Ellen Rader Smith, a licensed occupational therapist, to perform an FCE of him. Ms. Smith tested Plaintiff's "limitations to prolonged sitting" by observing his "abilities [sic] to remain seated for extended periods." Ms. Smith reported that Plaintiff could sit for twenty to forty-five minutes before he needed to stand up and take a break. Ms. Smith concluded that Plaintiff could not "perform sustained or constant sitting during the day, even with short breaks" and therefore could not perform "any sedentary work that requires sustained sitting."

On June 28, 2010, Plaintiff appealed the termination of his benefits. Reed submitted the appeal file to Renat Sukhov, M.D. Dr. Sukhov expressed the belief that "[b]ased upon the objective medical information provided for review, there is not documented

6

evidence of functional limitations that supports the inability to work." Instead, Dr. Sukhov noted that the January 7, 2010 FCE performed by Mr. Filippone and the January 27, 2010 exam by Dr. Barr indicated that Plaintiff was physically able to work a sedentary job. Dr. Sukhov found that Plaintiff could sit and work for six hours in an eight-hour workday with breaks to walk for two hours. Dr. Sukhov reviewed the November 13, 2008 MRI of Plaintiff's lumbar spine and agreed that the MRI revealed injuries, but suggested that these injuries "may not necessarily" cause Plaintiff pain because a significant minority of the population has asymptomatic herniated discs. Dr. Sukhov also referenced medical guidelines indicating that lumbar disc injuries can generally be expected to heal within fourteen to eighty-four days of medical leave.

On August 10, 2010, Reed upheld the denial of LTD benefits. The letter notifying Plaintiff of this decision relates that: "[b]ased upon the objective medical information provided for review, there is not documented evidence of functional limitations that supports the inability to work. Functional capacity evaluation reports as well as IME evaluations demonstrated evidence of functional abilities to perform sedentary work with frequent change of position."

Plaintiff filed his second appeal on August 24, 2010. Kevin Trangle, M.D. reviewed the file for Defendant and prepared a report. Dr. Trangle's report noted that the July 23, 2009 FCE was marred by Plaintiff's self-limited performance, the January 7, 2010 FCE showed Plaintiff could work, and the June 23, 2010 FCE's conclusion of disability was "not validated by any objective measurements for testing for consistency or maximum effort." Dr. Trangle asserted that there was no objective evidence that Plaintiff suffered from "cervical and vertebral disc without myelopathy, neuritis, [or] radiculitis" or "spinal artery and vertebral artery compression." He determined that Plaintiff's objectively proven back conditions (including facet hypertrophy, disc herniation, nerve

root edema, nerve root compression, nerve root impingement, and stenosis) "would not preclude him from working in a sedentary position." Finally, Dr. Trangle concluded that tenosynovitis limited Plaintiff's standing and walking ability, "but it does not limit him in his ability to do sedentary work."

Mr. McDonald, on behalf of the Defendant, reviewed the entire file and upheld the denial of LTD benefits. Mr. McDonald responded specifically to a number of Plaintiff's critiques of the first appeal decision. Mr. McDonald noted that while Plaintiff had submitted proof that he was found eligible for SSDI benefits, the Social Security Administration's ("SSA") decision was not controlling because the SSA relied on different evidence than Defendant and the SSDI definition of disability differs from the Plan's definition. Mr. McDonald found that Plaintiff's difficulty coping with full-time work in March to July 2009 was not relevant because Mr. Filippone and Dr. Barr's conclusion that Plaintiff could work was more recent in time and thus superceding.

Relying on Dr. Barr's January 27, 2010 IME, Mr. Filippone's January 7, 2010 FCE, Dr. Sukhov's review, and Dr. Trangle's review, Mr. McDonald determined that "[t]he documentation contains substantial objective evidence to support Reed's initial determination that [Plaintiff] was capable of work at a sedentary level, with certain restrictions and limitations, and was no longer disabled under the terms of the Plan, as of March 10, 2010." However, Mr. McDonald's added to the confusion surrounding Dr. Barr's opinion of Mr. Filippone's work by asserting that "Dr. Barr disagreed with the results of the January 2010 FCE."

## II

Here, as mentioned above, both Plaintiffs and Defendant move for summary judgment. Such competing motions "are no more than a claim by each side that it alone is entitled to summary

judgment." *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (internal quotation marks and citation omitted). The fact that both sides to a dispute have moved for summary judgment does not require the Court to grant summary judgment in one side's favor. *See F.A.R. Liquidating Corp. v. Brownell*, 209 F.2d 375, 380 (3d Cir. 1954) ("[I]t is well established that cross-motions for summary judgment do not warrant the trial court granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.") (citations omitted). Put differently, "[t]he fact that both parties make motions for summary judgment, and each contends in support of his respective motion that no genuine issue of fact exists, does not require the Court to rule that no fact issue exists." *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).

ERISA plan participants may bring a civil action to "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B). If an ERISA plan's terms provide the plan administrator with discretionary authority to determine benefits eligibility, then the administrator's decision to deny benefits will be upheld unless it is "arbitrary and capricious." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845-46 (3d Cir. 2011) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–16 (2008)). Defendant is vested with the power to "construe and interpret the provisions of the Plan." (Defendant's Facts, ¶ 8). Accordingly, the parties agree that the arbitrary and capricious standard of review applies. (Plaintiff's Moving Br., p. 14; Defendant's Moving Br., pp. 5-6).

"An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Miller*, 632 F.3d at 845 (quoting *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). "A decision is supported by substantial

evidence if there is sufficient evidence for a reasonable person to agree with the decision." *Howley v. Mellon Fin. Corp.*, 531 F. Supp. 2d 645, 648 (D.N.J. 2008) (citing *Courson v. Bert Bell NFL Player Ret. Plan*, 214 F.3d 136, 142 (3d Cir. 2000)). "[T]he record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d Cir. 2010) (citation omitted).

In this case, the opinions of Dr. Barr are relied upon by Dr. Sukhov, Dr. Trangle and Mr. McDonald. Dr. Barr's opinions, in my view, conflict with each other. They are not clear and unambiguous. Certainly anyone acting as a reasonable neutral decision-maker would verify Dr. Barr's conclusion and opinions by communicating with him rather than attempting to construe them independently without any support. This is especially true where a telephone call to Dr. Barr could be accomplished easily.

The failure to verify Dr. Barr's opinion may constitute procedural irregularities in the claim review process and indicate that the plan administrator did not act as a neutral arbiter, and thereby breached his fiduciary duty to the plan participants. *Miller*, 632 F.3d at 856. The existence of an irregularity is a factor favoring the conclusion that denial of benefits may have been arbitrary and capricious. *Miller*, 632 F.3d at 848, 855. Here, the Plan Administrator must verify the opinions of Dr. Barr and reconsider them in light of all the other facts. Since the Court has discretion in selecting a remedy, the Court remands the matter to the Plan Administrator so that it may verify Dr. Barr's opinions.

ORDER

IT IS on this 1st day of February, 2012,

ORDERED:

1. Plaintiffs' Motion for Summary Judgment (Docket Entry 13) is denied.

2. Defendant's Cross Motion for summary judgment is (Docket Entry 14) is denied.

3. The matter is remanded to the Plan Administrator to verify Dr. Barr's diagnosis and opinion and to re-evaluate the findings and opinion of the Plan Administrator.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

February 1, 2012